The Memorandum Decision below is hereby signed.

Dated: April 9, 2008.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                           )
                                )
ETHEL J. DAWSON,                )      Case No. 04-00531
                                )      (Chapter 13)
                Debtor.         )
_____ )
                                )
ETHEL J. DAWSON,                )
                                )
                Plaintiff,      )
                                )
        v.                      )      Adversary Proceeding No.
                                )      04-10083
JAMES B. THOMAS, *et al.*,      )      FOR PUBLICATION IN WEST'S
                                )      BANKRUPTCY REPORTER
                Defendants.     )

MEMORANDUM DECISION
(FINDINGS OF FACT AND CONCLUSIONS OF LAW)

By her amended complaint, the plaintiff, Ethel J. Dawson,

objects to the proof of claim filed by James B. Thomas (who made

a $35,000 loan to Dawson secured by her residence pursuant to a

deed of trust, a form of mortgage utilized in the District of

Columbia) and seeks affirmative relief against Thomas and Jack

Merwin (the broker of the loan from Thomas) under various

statutes regulating consumer lending activity.  This constitutes

the court's findings of fact and conclusions of law.[1]

I

BASIC FACTS

Dawson owns real property ("the Property") which is a single family residence located at 500 23d Place, N.E., Washington, D.C. Dawson has resided there since at least the early 1990s, and has continuously resided there.   The tax assessment records reflect that despite the property being her only residence, she has never availed herself of the homestead deduction for real estate tax purposes.   She was unaware that she was not taking the deduction, a reflection of her sophistication level.   Dawson has never bought or owned rental real estate.

Sometime prior to September 2003, Dawson fell into arrears in paying the holder of a note secured by the first deed of trust on the Property, and the trustees under that deed of trust issued a notice of foreclosure sale to be held on September 18, 2003. By the eve of the foreclosure sale, the reinstatement amount was $8,629.77.

Thomas is a real estate agent who has also, for some time, engaged in making real estate loans.  By the end of 1999, he

---

[1]  Although the court did not determine whether this matter is a core or non-core proceeding at the initial scheduling conference, see Scheduling Order (DE No. 13, entered December 2, 2004), pursuant to Fed. R. Bankr. P. 7012(b), the defendants Thomas and Merwin have consented to this court's entry of final orders and judgments. See Answers to Amended Complaint (DE Nos. 20 and 21, filed December 14, 2004).

decided not to engage in any residential lending due to the laws regulating such lending, and has turned away any borrowers requesting that he make loans secured by owner-occupied property. Thomas engages principally in renovation loans, which he considers to be bridge loans that permit an owner of rental property to renovate the property for sale.  The primary reason Thomas extends such loans has been to obtain the listing to sell the property as the borrower's real estate agent.

Starting in approximately 1998, Merwin and Thomas began a business relationship in which Merwin would act as a mortgage broker to originate borrowers for real-estate-secured loans to be extended by Thomas, with Merwin receiving a commission for loans that went to closing.  Merwin became aware of the imminent foreclosure sale of Dawson's Property by consulting public notices of such sales.  Acting as Thomas's agent, Merwin mailed a flyer to Dawson at the Property address.  The flyer offered Thomas's help in avoiding foreclosure.  The precise contents of that flyer are unknown, but such flyers generally offered to help avoid foreclosure by way of a loan, meeting Thomas's criteria for commercial non-owner occupied property loans, to bring current the payments on the note secured by the deed of trust which was the subject of the foreclosure.  Within three or four days before the scheduled foreclosure sale, Dawson placed a telephone call to the number provided on the flyer and spoke to Merwin.

3

Merwin stood to earn a handsome commission of $5,000 if Dawson borrowed from Thomas, and he was well aware that Thomas's loan terms would be legally impermissible if treated as a consumer rather than as a commercial loan. This may explain why, when speaking with Dawson on the telephone, Merwin did not probe with any depth to verify that Dawson did not occupy the Property and why he never even asked if she intended to occupy the Property in the future. During the telephone conversation, Merwin merely asked Dawson if she lived at the Property and she replied that she did not, after which Merwin turned to such topics as the Property's value and arranging to meet with Dawson. Merwin did not inquire into Dawson's income, including whether she worked, and did not request that she bring any documents with her to their meeting, which was scheduled to take place the following day.

The next day, Merwin met with Dawson at the Property. Present at the Property when Merwin arrived were Dawson, a woman introduced as a neighbor, and a man introduced as a tenant. Merwin cannot recall what words were used to introduce the man as a tenant other than that the word "roomer" was not used. Dawson has, on occasion, rented out a room in the Property, and at the time of the meeting with Merwin she was renting a room to a Mr. Spencer. Dawson has never rented the entire Property. Merwin engaged in no conversation with the tenant separate from Dawson.

4

Merwin did not obtain a copy of the tenant's lease or inquire into the terms of the lease, including whether the tenant was renting the entire house.  Nor did he request a copy of the first deed of trust on the Property.[2]  Merwin was not concerned regarding whether Dawson had ever occupied the Property as he relied on her statement that she did not live at the Property.

Dawson told Merwin that she was living with her daughter, and gave Merwin the daughter's address, which was within walking distance of the Property.  Dawson's daughter has from time to time lived with Dawson in the Property, and was doing so at the time that the foreclosure sale was imminent.  Dawson has never lived with her daughter elsewhere, as the daughter has never had a place of her own where Dawson could live with her.  Her daughter lives "here and there," as Dawson put it, living for free with various persons.  Merwin did not inquire whether Dawson's stated arrangement of living with her daughter was only temporary.  Nor did Merwin request any statement from the daughter verifying the arrangement, or verifying that the daughter was rightfully in possession of a residence at which Dawson could live.  Nor did Merwin request bank account

---

[2]    That deed of trust, appended to the holder's proof of claim in Dawson's bankruptcy case, contains a standard covenant wherein Dawson promised to occupy the Property as her primary or secondary residence because the lender makes non-owner residence loans on different terms, but the court need not rely upon it in finding that Dawson occupied the Property as her residence.

statements, a driver's license, or other documents showing Dawson as living anywhere other than at the Property.

On the one occasion that Merwin visited the Property, he went into the Property with Dawson, stood in the kitchen and looked in the living room. He outlined to Dawson Thomas's normal lending terms, and asked Dawson if she thought she would be successful in repaying the loan. Dawson said that she was going to sell the Property and move in with her son, that she regretted having to sell the Property but that she and her son had determined that she should move in with her son. Merwin apparently did not probe Dawson as to why she regretted selling the Property if it was rented out to someone else and she was already living elsewhere with her daughter. In fact, Dawson had no intention of renting the Property, selling the Property, or moving out of the Property. Merwin never explained to Dawson the meaning of the term commercial loan.

Either before or after the visit, Merwin examined the tax assessment record for the Property as posted on the internet by the District of Columbia government. It revealed the Property's assessed value, and also that Dawson was not receiving the homestead deduction. However, it also listed Dawson's mailing address as being the same as the Property's address. Merwin did not inquire of Dawson why she was using the Property as her mailing address if she was renting it out to someone else. Nor

6

did Merwin inquire of Dawson whether she had ever lived at the Property or claimed the homestead exemption when she was living there.  Dawson's failure to take the homestead exemption while living there would have been indicative that the failure presently to claim the homestead exemption ought not be taken as evidence that she was not living there now.

Merwin contacted Thomas to refer Dawson as a borrower, and reported to Thomas what he, Merwin, had learned.  Thomas's file contains a note reciting:

> Referral from Jack
> 500 23rd Pl NE
> Owner Ethel Dawson
> Facing foreclosure
> Rental
> No Homestead Exemption in the record, son (attorney)
> says she will sell
> Needs: $15,000 for repairs
>       = $9,000 to reinstate

Thomas, who is a real estate broker, did a so-called competitive market analysis and satisfied himself that there was sufficient equity in the property to cover the existing secured debt as well as the loan he would make.  Accordingly, Thomas approved a loan for $35,000 which was to cover reinstatement of the note secured by the first deed of trust, settlement charges, and any cash to be received by Dawson.

Either before or after he called Thomas to refer the requested loan for Thomas's approval, Merwin called Cosmopolitan Real Estate Settlements, Inc. ("Cosmopolitan") to order a title

7

report which ordinarily is made available within 24 hours.  The
title was acceptable for loan purposes.  Accordingly, Merwin
arranged for a paralegal at Cosmopolitan to call Dawson to
arrange the settlement at which the loan would be closed.

The closing of the loan occurred on September 17, 2003, at
Cosmopolitan's office in Silver Spring, Maryland.  Thomas
delivered a check for the loan amount to Cosmopolitan's offices
on the morning of the day the loan was to close, but he did not
stay for the closing.  Included in the closing costs were a
$5,000 "Lender's Fee" to be paid to Thomas and a $5,000
"Consulting Fee" to be paid to Merwin.

Dawson's son, who lives in Philadelphia, Pennsylvania,
called Merwin the day of the closing and explained that Dawson
was still planning to borrow, but wanted to know if additional
dollars could be lent to prepare the Property for sale (e.g., for
carpet replacement).  This is a confusing aspect of the evidence.
Thomas testified that when Merwin called him sometime prior to
the day of the closing he learned of a statement by Dawson's son
that Dawson was going to sell (as reflected by Thomas's file
note).  However, Merwin never testified to any conversations with
Dawson's son other than on the morning of the day of the closing.
It is possible that Thomas is in error in thinking that he had
only one conversation with Merwin.  In other words, it is
possible that Merwin called Thomas the morning of the closing and

8

relayed the son's conversation to Thomas, with the result that
Thomas increased what he would otherwise have lent, and delivered
the larger loan amount that morning to Cosmopolitan.  Thomas's
note, however, does not show that a smaller loan had been under
consideration in Merwin's first call to him, and it would be odd
for Thomas's note not to include the amount initially under
consideration.  Fortunately, the court need not resolve this
confusion.

The closing was conducted by an attorney, Ralph A. Bernardo,
acting as Thomas's agent.  No one asked Dawson to bring any
documents to the closing, and she was not furnished with any of
the closing documents until the closing was held.  At the
closing, Dawson was accompanied by Samuel S. Logan, a close
friend who has known her since the late 1980s, sometime after
Dawson's husband had died.  Only Dawson, Logan, and Bernardo were
present at the closing.

Bernardo asked Dawson where she lived and she told him she
resided at 500 23d Place, N.E. (that is, at the Property).
Moreover, the HUD-1 form (Settlement Statement) indicates that
Dawson's address is the same as the Property's.  Dawson presented
her driver's license which listed her address as being the same
as the Property's, and Bernardo made a copy for the closing
files, and transmitted a copy with the loan documents to Thomas
on September 28, 2003.

9

Bernardo had Dawson sign documents at the closing, including the following which indicated that the loan was for commercial, investment, or business purposes:

- a Commercial Loan Balloon Deed of Trust (Second Trust);

- a Ballon Deed of Trust Note (Second Trust); and

- a Business and Investment Affidavit.

The loan documents also included an Assignment of Contracts, Income Leases, Rents and Profits.  Merwin and Thomas point to no other loan documents that bear on the issue of whether this was acknowledged by Dawson to be a non-owner-occupied or commercial or business or investment purpose loan.

Bernardo briefly described each document to Dawson and Logan before Dawson signed the document.  Neither Dawson nor Logan fully understood the documents.

None of the loan documents indicate that Dawson resided anywhere other than at the Property.  Nor do they indicate that Dawson did not intend to occupy the Property after the loan was made.  Nor do they indicate that Dawson intended to sell the Property.

The Business and Investment Affidavit indicated that Dawson "agrees that the . . . loan . . . is for business and investment purposes only: Stop foreclosure/renovate."  Dawson indeed was borrowing for the stated purpose of stopping the foreclosure sale and renovating the Property.  However, that does not necessarily

10

make the loan one obtained solely for business and investment
purposes.  A loan secured by real estate that is occupied as the
owner's principal residence and that is made for the purpose of
stopping foreclosure or renovating the property is a loan for
personal household purposes.[3]

Dawson, who is extremely unsophisticated in financial
affairs, could view saving her house from foreclosure as serving
a business and investment purpose in the sense of saving the
house from foreclosure so that she would not lose the equity in
the Property and allowing her to renovate the Property so as to
enhance the property's value or fitness for sale.  The Affidavit
did not extract a sworn statement by her that she was not
residing in the Property and did not intend to reside in the
Property, and her statement that the loan was for only the stated
business and investment purposes of stopping foreclosure and
renovating the Property could be viewed by her as truthful.

In any event, her signing of the Affidavit did not negate
the personal, household character of the loan.  Bernardo, as an
attorney, should have been well aware that this loan, which was
secured by owner-occupied property, had to be characterized as
one for personal, household purposes.  That knowledge must be
charged to Thomas.

---

[3]  The court will explore this issue in more detail when
considering the applicability of consumer protection statutes to
the instant transaction.

Similarly, the Note itself indicates that "THIS LOAN IS
BEING MADE FOR COMMERCIAL OR INVESTMENT PURPOSES PURSUANT TO
SECTION 28-3301 OF THE DISTRICT OF COLUMBIA CODE." Dawson and
Logan had no idea what section 28-3301 of the D.C. Code entailed.

Finally, the Commercial Loan Balloon Deed of Trust (Second
Trust) included a similar reference to section 28-3301 of the
D.C. Code but like the Note did not include any representation
that Dawson was not residing in the Property and did not intend
to reside in the Property. Indeed, the Commercial Loan Balloon
Deed of Trust (Second Trust) included a paragraph 20 entitled
"OCCUPANCY" which contained no text whatsoever and was followed
by a Cross Collateralization provision of no relevance to the
owner-occupancy issue.

Although Dawson signed an Assignment of Contracts, Income
Leases, Rents and Profits, she made no representation in the
Assignment or in any other document or even orally to Bernardo
that she was not occupying the Property, or that she was renting
the Property to anyone.[4]

Thomas is charged with Bernardo's knowledge that Dawson
resided in the Property. Once Bernardo was told that Dawson
occupied the Property, Thomas (acting through Bernardo), ought

---

[4] Although unnecessary to this decision, the court notes
that the first deed of trust included an assignment of rents
albeit not as lengthy a one as the Assignment Dawson executed in
favor of Thomas.

12

not have made the loan other than as a loan secured by owner-occupied property.

Moreover, Thomas's other agent, Merwin, failed on behalf of Thomas to observe the standard of care applicable to making commercial loans for non-owner-occupied property.  Merwin willfully and unreasonably failed to make additional inquiries that a lender reasonably ought to make to assure that Dawson's statements to him regarding occupancy were accurate.  As Dawson's expert explained, a failure to claim a homestead deduction does not suffice to demonstrate that a property is non-owner-occupied, and the standard of care in the case of loans secured by non-owner-occupied real property requires something more than the oral statements upon which Merwin relied.  At a minimum, Merwin should have inquired into the terms of the lease with the tenant, requested a copy of the lease, and probed Dawson more extensively regarding her living arrangement with her daughter and what documentation she could furnish to verify that arrangement.  He willfully turned a blind eye to those matters.

Thomas did not follow the standard of care necessary to ascertain that, aside from her equity in the Property, Dawson could reasonably be expected to make the scheduled payments required by the loan.  In this regard, Dawson received only $14,206.76 in cash from the loan, but Thomas's note indicates that $15,000 was needed for repairs.  Accordingly, Thomas could

13

not reasonably look to the cash as a source for interest payments on the note, and he had no other evidence regarding Dawson's income and expenses, and ability to repay the loan.

Dawson received, directly or indirectly, a total of only $23,340.50 in property as a result of the transaction: $8,629.77 used to reinstate her existing mortgage obligation; $14,206.76 in cash; and payment of $503.97 in property taxes. In other words, a staggering $11,659.50 of the $35,000.00 loan proceeds went to fees and finance charges constituting previously non-existent obligations of Dawson. Dawson subsequently made $2,841.34 in payments to Thomas on the new debt owed him. Reducing the $23,340.50 by the $2,841.34 in payments Dawson made, she has received a net amount of $20,499.16 in the transaction.

The promissory note Dawson executed called for interest only payments of $466.67 per month, with the entire loan to be paid by March 17, 2004, six months after the closing of the loan. The note bore interest at the rate of 16% per annum, but with the interest rate to be automatically increased to 24% per annum if Dawson should ever be in default.

II

CONTINUED JURISDICTION OF THE BANKRUPTCY COURT

Although the bankruptcy case in which this adversary proceeding is being pursued was dismissed on March 15, 2006, the court concludes that it has continued jurisdiction over this

14

matter.  See Swinson v. Coates & Lane, Inc. (In re Swinson), slip
copy, 2004 WL 3779953 (Bankr. D.D.C., July 27, 2004).  As
discussed in Swinson, the decision of whether to retain
jurisdiction over an adversary proceeding in light of the
bankruptcy case's dismissal "should be left to the sound
discretion of the bankruptcy court . . . where the adversary
proceeding is pending."  Id. at *3 (quoting In re Porges, 44 F.3d
159, 162-63 (2d Cir. 1995)).  In making its determination, the
court must consider judicial economy, convenience to the parties,
fairness and comity.  Id.  The court concludes that all of these
factors weigh in favor of this court's continued jurisdiction
over this adversary proceeding.

     Judicial economy and convenience to the parties are both
served by this court's retention of jurisdiction given that the
matter has been fully tried and a dismissal without resolution
would require the parties to commence a new proceeding in another
forum, an undertaking that would be both costly and time-
consuming.  Furthermore, it would require another court to engage
in the duplicative effort of adjudicating the entire dispute.

     Fairness likewise weighs is favor of retained jurisdiction.
Not only has neither party sought dismissal of the adversary
proceeding based upon dismissal of the bankruptcy case, but a re-
adjudication of this dispute in another forum would inevitably
result in a further accumulation of legal fees, provide the

15

parties with an unwarranted second bite at the apple, and delay
resolution of this adversary proceeding which has been pending in
this court for over three years.

Finally, as in Swinson, the court finds that comity weighs
in favor of retained jurisdiction given that the difficult issues
involved are mostly factual, the legal issues are relatively
straightforward, and little purpose would be served by unloading
this litigation on another busy court. Id. at * 5.

Accordingly, the court determines that it would be an abuse
of its discretion to dismiss this adversary proceeding based
solely upon the prior dismissal of the bankruptcy case.

III

PROPRIETY OF DETERMINING THOMAS'S CLAIM

In her objection to Thomas's proof of claim, Dawson contends
that the proof of claim was untimely and failed to attach the
necessary support documents.  Dawson's objection further disputes
the amount of the claim and its secured status.  The court need
not consider the question of whether Thomas's claim should be
disallowed as untimely and lacking the necessary supporting
documents.  The underlying bankruptcy case was dismissed without
the debtor having received a discharge, mooting the legal
significance of allowance or disallowance of the claim for
purposes of Dawson's Chapter 13 bankruptcy case.

The amount of the claim and its secured status, however,

16

bear on the parties' non-bankruptcy law rights, and are issues
that were not mooted by the dismissal of the underlying
bankruptcy case.[5]  The court will accordingly proceed to determine
the validity of the claim and the amount of the claim.

IV

DAWSON'S TRUTH IN LENDING ACT CLAIMS
ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Some of Dawson's claims in her amended complaint are
pursued under the Truth in Lending Act ("TILA"), 15 U.S.C. §§
1601 - 1667f (2000) as amended by the Home Ownership and Equity
Protection Act of 1994 ("HOEPA").[6]  In their post-trial brief, the
defendants assert a statute of limitations defense as to the
alleged TILA claims in Count II and the alleged TILA claims
(identified as HOEPA claims) in Count III.[7]   As will be seen, to
the extent that Dawson asserts her TILA claims defensively by way
of recoupment against the debt owed Thomas, the statute of

---

[5]   In contrast, the court does not reach the question of
timeliness of Thomas's proof of claim as that no longer matters.
Having filed a proof of claim, Thomas necessarily put the
validity of that claim into play, and Dawson was entitled to
defend against that claim both as untimely and on the alternative
basis that the claim is, in part, invalid under nonbankruptcy law
and overstated.  In any event, Dawson's affirmative claims for
relief are obviously not moot.

[6]   HOEPA is Title I, subtitle B of the Riegle Community
Development and Regulatory Improvement Act of 1994, Pub. L. 103-
325, 108 Stat. 2160.

[7]   The defendants have not asserted a limitations defense
with respect to Dawson's rescission claim under TILA.

limitations is inapplicable.  Moreover, as explained in more

detail below, the defendants waived the limitations defense to

Dawson's assertion of affirmative claims under TILA by not

raising it in their pretrial statement or at trial, and in any

event, Dawson's claims are timely under the applicable

limitations period in light of 11 U.S.C. § 108(a)'s tolling

provision.

A.

WAIVER

Both defendants raised the limitations defense in their

respective answers to the amended complaint.  The joint pretrial

statement, however, which pursuant to the scheduling order was

required to "contain . . . a statement of defenses raised by the

parties . . . .", states only as follows:

> Defendants generally deny the factual allegations of
> the amended complaint.  They assert that the Loan was
> brokered and made to Dawson with the express
> understanding that Dawson, who was on the verge of
> foreclosure, was moving out of the House, and sought
> the Loan in order to (1) avoid a forced sale that would
> not give fair value, (2) pay off the arrearage on and
> reinstate the first deed of trust, (3) obtain funds to
> renovate the House, and (4) offer the House for sale on
> the market in order to obtain fair value.

> Consequently, Defendants contend that the House was
> investment property not subject to the statutory
> provisions and common law with respect to which Dawson
> complains.  If the House is not such investment
> property, Defendants contend that Dawson intentionally
> or negligently misrepresented it as such to Defendants,
> Defendants had no reason to know otherwise, and Dawson
> cannot therefore be heard to complain.

18

Following the pretrial conference, the court entered a pretrial

order, which provided that:

> The Pretrial Statements are hereby incorporated by
> reference into this Pretrial Order.  This Pretrial
> Order **supersedes the pleadings, governs the future
> course of proceedings in this adversary proceeding and
> may not be amended except by Order of this Court to
> prevent manifest injustice.**

[Emphasis added.]  Neither the joint pretrial statement nor the

pretrial order addresses the defendants' previously asserted

statute of limitations defense, and the defendants never sought

to have the pretrial order amended to preserve that defense.  The

pretrial order having superseded the previously filed pleadings

in this adversary proceeding, and the defendants having neglected

to take any steps between the entry of the pretrial order and the

conclusion of the trial to reassert the defense, it is waived.[8]


B.

RECOUPMENT

Moreover, even if Thomas had shown that Dawson is time-barred from seeking affirmative relief under TILA, Dawson is not time-barred from defensively asserting TILA violations in

---

[8] The defendants contend that "[t]he fact that the defense was raised by pleading but is now briefed after hearing does not constitute waiver, as 'the issue raised . . . is primarily legal,' and Dawson may now address it without any resulting prejudice.  See, e.g., 1301 Conn. Ave. Assocs., 126 B.R. 823 (Bankr. D.D.C. 1991)."  The facts of In re 1301 Conn. Ave. Assocs. are easily distinguishable from the instant dispute, and the court rejects the defendants' argument accordingly.  In In re 1301 Conn. Ave. Assocs., the defendant failed to timely assert a federal holder in due course defense in its answer, and did not raise that defense until the hearing on the defendant's motion for summary judgment.  The court excused the defendant's failure to timely plead the defense because the case supplying the legal basis for asserting the defense was not decided until after the commencement of the adversary proceeding.  The court further determined that because the issue was primarily legal and the plaintiff would have an opportunity to brief the issue, no prejudice to the plaintiff would result.  Id. at 827.  Unlike the defendant in In re 1301 Conn. Ave. Assocs., the defendants in this case have offered no excuse for their failure to preserve the defense and there is no suggestion that recent developments in the law would justify their failure to raise the defense in their pretrial statement.  It would be prejudicial to Dawson if, after presentation of evidence and argument, and after the close of briefing, the court were to consider the defendants' post-trial briefing on a defense that the defendants failed to assert in the joint pretrial statement, that was never made part of the pretrial order, that was not raised at trial, and by all appearances was abandoned by the defendants.  See Murray v. First Nat'l Bank of Chi. (In re Murray), 239 B.R. 728, 734 (Bankr. E.D. Pa. 1999) (failure to prove or argue limitations defense constitutes waiver of defense).

objecting to defendant Thomas's proof of claim.  See 15 U.S.C. §
1640(e); Horizon Fin., F.A., v. Norris (In re Norris), 138 B.R.
467, 470-71 (E.D. Pa. 1992); Soto v. PNC Bank (In re Soto), 221
B.R. 343, 359 (Bankr. E.D. Pa. 1998)(citing cases); Oldroyd v.
Assocs. Consumer Disc. Co., 863 F. Supp. 237, 240 (E.D. Pa.
1994)("Actions under the Truth in Lending Act must be brought
within one year of the violation, though a consumer may raise
violations of the Act as a defense to a collection action after
the expiration of the filing period"); In re United Cos. Fin.
Corp., 267 B.R. 524, 529 (Bankr. D. Del. 2000)(the one-year time
limitation set forth in § 1640(e) does not apply to a TILA
violation raised as a recoupment defense to a claim); Coxson v.
Commonwealth Mortgage Co. of Am. (In re Coxson), 43 F.3d 189,
193-94 (5th Cir. 1995)(mere fact that the debtors were the
plaintiffs did not preclude finding that their TILA claim was
raised defensively).[9]

C.

TIMELINESS UNDER THE TOLLING PROVISIONS OF 11 U.S.C. § 108(a)

The affirmative claims pursued by Dawson include claims
under TILA.  Even if the defendants had not waived the statute of

---

[9]  Because the statute of limitations does not bar Dawson's
claims, the availability of recoupment is an academic issue.
Recoupment is defensive in nature.  As to those amounts that
Thomas asserted in his proof of claim, Dawson would be entitled
to assert any time-barred TILA claims defensively as recoupment.

limitations defense, Dawson's TILA claims were timely filed.

Affirmative actions under TILA, are generally required to be brought within one year of the violation, 15 U.S.C. § 1640(e),[10] and actions for rescission must be brought within three days after consummation of the transaction, or in the event the relevant disclosures were never made, within three years after consummation.  15 U.S.C. § 1635 (a), (f).  In the instant case, Thomas failed to make the requisite disclosures, rendering the three-year limitation period for rescission applicable.  See In re Cmty. Bank of N. Va., 418 F.3d 277, 304-05 (3d Cir. 2005).

Violations of the disclosure requirements under TILA accrue no later than the settlement date, which in this case was September 17, 2003.  See Lawson v. Nationwide Mortgage Corp., 628 F. Supp. 804, 807 (D.D.C. 1986) ("In this circuit, violation of

---

[10]   A determination that Dawson is permitted to assert her TILA claims affirmatively as well as defensively is required because Dawson may not be entitled to recover attorney's fees if she asserts her TILA claims only defensively and by way of rescission.  See, e.g., Martinez v. Beneficial Tex., Inc. (In re Martinez), 2007 WL 1174186, at *6 n.5 (Bankr. S.D. Tex., April 19, 2007)(concluding that it was appropriate to treat the debtor's TILA claims as defensive in nature rather than as part of a complaint in an adversary proceeding seeking affirmative relief, but declining to "go so far as to conclude that the request for attorney's fees is part of a defense" and requiring the debtor to amend his complaint and objection to claim to remove demand for attorney's fees).  See also Anderson v. Lester, 382 So. 2d 1019, 1027-28 (La. Ct. App. 1980) (one-year limitations period barred fees in timely rescission action).  But see Burley v. Bastrop Loan Co., Inc., 407 F.Supp. 773, 779 (W.D. La. 1975) (one-year limitations period did not apply to attorney's fees claim in timely rescission action).

22

TILA occurs no later than the date of settlement of any loan for which required disclosures have not been made."); <u>Morris v. Lomas & Nettleton Co.</u>, 708 F. Supp. 1198, 1203 (D. Kan. 1989).  The complaint in the instant case was filed on September 23, 2004, less than one week after the one-year limitations period would have expired but for the intervention of the bankruptcy petition filing.  Accordingly, had bankruptcy not intervened, Dawson's affirmative claims under TILA, other than for rescission, would be time-barred.  As explained in more detail below, however, the court finds that 11 U.S.C. § 108(a)'s tolling provision is applicable not only to trustees and Chapter 11 debtors in possession, but also to chapter 13 debtors when suing on a cause of action on behalf of the estate.  Accordingly, Dawson's TILA claims, which she filed less than two years after the petition date, are timely.

Section 108(a) provides:

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of –
>
> (1)  the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2)  two years after the order for relief.

On its face, the tolling provision of § 108(a) is available only

to the bankruptcy trustee.  It is well-established, however, that § 108(a)'s two-year tolling provision may be invoked by Chapter 11 debtors in possession pursuant to § 1107(a), which grants a Chapter 11 debtor in possession all of the rights and powers of a trustee with certain exceptions of no relevance here.[11]  It is equally well-established that the extended limitations period of § 108(a) is not available to a chapter 7 debtor, or to a chapter 11 or chapter 12 debtor when the debtor is no longer a debtor in possession.[12]  What is less certain, however, is whether the privileges of § 108 can be invoked by a chapter 13 debtor, and there is relatively little case law addressing this specific issue.

Some courts hold that the provisions of § 108 apply to a chapter 13 debtor if the cause of action involved is property of the estate.  See In re Murray, 276 B.R. 869, 874 (Bankr. N.D. Ill. 2002)(analogizing chapter 13 debtors to chapter 11 and chapter 12 debtors-in-possession and concluding that "§ 108(b)

---

[11]    See Johnson v. First Nat'l Bank of Montevideo, 719 F.2d 270, 278 n.11 (8th Cir. 1983) ("Although the language of § 108 refers only to the trustee, it is generally agreed that the debtor-in-possession is also entitled to the statute's privileges."); In re Greater Southeast Community Hosp. Corp. I, 333 B.R. 506, 535 (Bankr. D.D.C. 2005); Ranasinghe v. Compton (In re Ranasinghe), 341 B.R. 556, 564 (Bankr. E.D. Va. 2006); TCI Ltd. v. Sears Bank & Trust Co. (In re TCI Ltd.), 21 B.R. 876, 878 (Bankr. N.D. Ill. 1982); Motor Carrier Audit & Collection Co. v. Lighting Prods., Inc., 113 B.R. 424, 426 (N.D. Ill. 1989).

[12]    See In re Ranasinghe, 341 B.R. at 564.

[which, like § 108(a), applies to "the trustee"] should apply to
Chapter 13 debtors who are entitled to remain in possession of
all property of the estate and retain the right to any cause of
action that would otherwise pass to a trustee."); <u>see also</u> <u>Thomas
v. GMAC Residential Funding Corp.</u>, 309 B.R. 453 (D. Md. 2004)
(permitting chapter 13 debtor to invoke the 60-day extension of §
108(b) to preserve a claim for rescission under TILA).  Other
courts hold that § 108(a) is unavailable to a chapter 13 debtor.
<u>Estate of Carr ex rel. Carr v. United States</u>, 482 F. Supp. 2d
842, 850 (W.D. Tex. 2007); <u>Ranasinghe v. Compton (In re
Ranasinghe)</u>, 341 B.R. 556, 564-66 (Bankr. E.D. Va. 2006); <u>Bowen
v. Lee Lewis Constr., Inc. (In re Bowen)</u>, 2004 Bankr. LEXIS 356,
at *25 (Bankr. N.D. Tex. March 29, 2004); <u>Craig v. Barclays Am.
Fin., Inc. (In re Craig)</u>, 7 B.R. 864 (Bankr. E.D. Tenn. 1980).

     The order confirming Dawson's chapter 13 plan specifically
provided that the property of the estate would not re-vest in
Dawson until payments under the plan were completed and she
received a discharge.  When Dawson commenced this adversary
proceeding, she had not completed plan payments and her claims in
this adversary proceeding remained property of the estate.  The
critical issue is whether Dawson exercised a trustee's power in
pursuing those claims.  If she did so act, it stands to reason
that she may invoke § 108(a).

     To determine whether § 108(a)'s tolling provision is

25

applicable to a chapter 13 debtor, one must examine the authority

under which various entities are authorized to pursue a

prepetition cause of action that became property of the estate.[13]

As discussed below, the entity empowered to pursue such a cause

of action in a chapter 7 case is the trustee; in chapters 11 and

12, it is the debtor in possession (unless and until the debtor

in possession is removed as a debtor in possession and the power

passes to the trustee); and in chapter 13, it is the debtor.

Under 11 U.S.C. § 323(a), a trustee in a bankruptcy case is

"the representative of the estate," and under 11 U.S.C. § 323(b)

the trustee "has capacity to sue and be sued."  The purpose of §

323 is to make clear that when the trustee sues, standing in the

shoes that the debtor occupied prepetition as to a claim that has

become property of the estate, he has the necessary authority to

do so even though the Bankruptcy Code does not make a trustee the

owner of the estate but only its representative.  See York v.

Bank of America, N.A. (In re York), 291 B.R. 806, 814 (Bankr.

---

[13] There are certain avoidance causes of action under the
Bankruptcy Code (see, e.g., 11 U.S.C. § 547) that the Bankruptcy
Code expressly authorizes "the trustee" to pursue, but such
avoidance causes of action are not property of the estate
(although a recovery pursuant to an avoidance power is property
of the estate under 11 U.S.C. § 541(a)(3)).  Dawson's claims were
not avoidance causes of action, but instead prepetition causes of
action that became property of the estate.

E.D. Tenn. 2003).[14]

Beyond § 323, another provision, 11 U.S.C. § 363, which
applies in chapters 7, 11, 12, and 13 by reason of 11 U.S.C. §
103(a), confers power on "the trustee" to pursue a prepetition
cause of action that is property of the estate.  See Henneghan v.
Columbia Gas of Va., Inc. (In re Henneghan), 2005 WL 2267185, at
*6 (Bankr. E.D. Va. June 22, 2005) ("The only way to 'use' a
cause of action is to bring suit upon it or settle it.").
Section 363(c)(1) generally authorizes a trustee to "use" the
property of the estate in the ordinary course of business if
authorized to operate the debtor's business, and § 363(b)(1)
generally authorizes a trustee, subject to a requirement of
notice and a hearing, to "use" such property even if such use is
not in the ordinary course of business.

Who is the entity empowered to utilize a trustee's powers
under § 363 in chapters 11, 12, and 13, and to sue pursuant to

---

[14]  A chapter 7 trustee's power to pursue a debtor's causes
of action that became property of the estate flows, as well, from
the trustee's obligation under 11 U.S.C. §§ 704(1) (renumbered §
704(a)(1) by BAPCPA) to "collect and reduce to money the property
of the estate. . . ."  However, § 704(1) is inapplicable to
trustees and debtors in chapters 11, 12, and 13.  11 U.S.C. §
103(a).  This is understandable.  In a chapter 11 case the best
interests of creditors in the case may be a reorganization plan
instead of a liquidation plan.  In chapters 12 and 13, the debtor
generally remains in possession of the property of the estate, 11
U.S.C. §§ 1207(b) and 1306(b), and a plan is generally funded via
payments from the debtor.  11 U.S.C. §§ 1222(a) and 1322(a).
Nevertheless, pursuit of an estate cause of action may furnish
proceeds with which to fund a plan.

that provision on a cause of action that is property of the

estate?  In chapter 11, a trustee, when one is appointed, is

vested with a trustee's powers under § 363.  11 U.S.C. § 103(a).

In both chapter 11 and 12, however, a debtor in possession[15] has,

with exceptions of no relevance here, "all the rights . . . and

powers . . . of a trustee serving in a case under [chapter 11]."

11 U.S.C. §§ 1107(a) and 1203.  It follows that the debtor in

possession in chapter 11 or 12, until removed as such, enjoys the

powers of a trustee under § 363, including pursuit of causes of

action that are property of the estate, and, in any event, could

invoke § 323 to pursue such causes of action.

Chapter 13 is the odd duck when it comes to pursuit of a

prepetition cause of action that is property of the estate.  As

in chapter 12, a trustee serves in every chapter 13 case, and

receives and disposes of the payments the debtor makes under a

plan.  11 U.S.C. §§ 1302(a), 1322(a)(1), and 1326(a)(2).  As in

chapters 11 and 12, the trustee is not directed to liquidate the

property of the estate as is a chapter 7 trustee pursuant to §

704(1).  However, unlike debtors in possession in chapters 11 and

---

[15] A debtor in possession in chapter 11 is a debtor in a
case in which a trustee is not serving.  11 U.S.C. § 1101(1).
Although a trustee serves in every chapter 12 case, receiving and
disbursing plan payments, the debtor acts as a debtor in
possession (an undefined term in chapter 12) until removed as
such.  11 U.S.C. § 1204(a).  In both chapter 11 and 12, a debtor
in possession has, with exceptions of no relevance here, "all the
rights . . . and powers . . . of a trustee serving in a case
under [chapter 11]."   11 U.S.C. §§ 1101(1) and 1203.

12, the chapter 13 debtor is not generally vested with the powers
of a chapter 11 trustee.

Instead, a chapter 13 debtor is vested with only some of the
powers of a trustee.  The debtor remains in possession of the
property of the estate, except as provided in a confirmed plan or
the order confirming a plan.  11 U.S.C. § 1306(b).[16]  Thus, § 363,
if it applied to the trustee, would not authorize the trustee to
sue on a cause of action that, as in this proceeding, became
property of the estate and remained in the debtor's possession.
However, the cause of action does not disappear into a black hole
for lack of the chapter 13 trustee's ability to sue on the cause
of action.  The chapter 13 debtor, to the exclusion of the
trustee, is vested with a trustee's powers under § 363(b) and §
363(c) to use property of the estate.  First:

> Subject to any limitations on a trustee under this
> chapter, the debtor shall have, exclusive of the
> trustee, the rights and powers of a trustee under
> sections 363(b), 363(d), 363(e), 363(f), and 363(l), of
> this title.

---

[16]  Section 1306(b) provides that "[e]xcept as provided in a
confirmed plan or order confirming a plan, the debtor shall
remain in possession of all property of the estate."  In Dawson's
bankruptcy case, the confirmed plan and the confirmation order
did not alter the rule that the debtor was to remain in
possession of the property of the estate (for example, none of
the property of the estate was conveyed to a creditor in
satisfaction of its claim), and the confirmation order provided
that the property of the estate would not re-vest in the debtor
until after plan payments were completed.  Dawson enjoyed,
exclusive of the trustee, the rights and powers of a trustee
under §§ 363(b) and 363(c) to use that property.

29

11 U.S.C. § 1303.  In addition:

> Unless the court orders otherwise, a debtor engaged in
> business may operate the business of the debtor and,
> subject to any limitations on a trustee under sections
> 363(c) and 364 of this title and to such limitations or
> conditions as the court prescribes, shall have,
> exclusive of the trustee, the rights and powers of the
> trustee under such sections.

11 U.S.C. § 1304(b).  Section 363(b) addresses a trustee's power

to use property of the estate other than in the ordinary course

of business, and § 363(c) addresses a trustee's power to use

property in the ordinary course of business.  Thus, pursuant to

§§ 1303 and 1304, all of the powers of a trustee under § 363 to

use property of the estate reside in the chapter 13 debtor, not

the chapter 13 trustee.  To recapitulate, although § 1306(b) does

not state that a debtor may pursue an estate cause of action that

is in his possession, §§ 1303 and 1304, in bestowing a trustee's

powers under §§ 363(b) and 363(c) on the debtor, authorize a

chapter 13 debtor, subject to the limitations imposed on a

chapter 13 trustee, to exercise the power of a trustee to "use"

such a cause of action, which includes pursuing the same.

Based on a chapter 13 debtor's right pursuant to § 1303 to

utilize a trustee's power under § 363 to "use" the property of

the estate in the debtor's possession under § 1306, a chapter 13

debtor steps into the shoes of a trustee and may sue on a cause

of action that is property of the estate.  This was the

conclusion reached by the first Court of Appeals decision to

30

address the issue, <u>Maritime Elec. Co., Inc. v. United Jersey
Bank</u>, 959 F.2d 1194, 1209 n. 2 (3d Cir. 1991) (relying on §§ 1303
and 1306, the Court of Appeals holds that a chapter 13 debtor
"retains possession of and may use all the property of his
estate, including his prepetition causes of action, pending
confirmation of his plan."). Subsequent decisions have similarly
concluded that a chapter 13 debtor may sue on prepetition causes
of action that became property of the estate. <u>See Cable v. Ivy
Tech State Coll. (In re Cable)</u>, 200 F.3d 467, 472 (7th Cir. 1999)
(describing the effect of § 1303 as being that "debtor-in-
possession has substantially [the] same powers as the trustee in
other chapters"); <u>Autos, Inc. v. Gowin</u>, 2007 WL 2269443, at *3-4
(10th Cir. Aug. 9, 2007)[17] (in concluding that the debtor could
sue, the Court of Appeals observed that "[t]he Bankruptcy Code
allows a Chapter 13 debtor to step into the shoes of the trustee
with respect to a number of functions," <u>citing</u> § 1303 and Fed. R.
Bankr. P. 6009); <u>In re York</u>, 291 B.R. at 815 ("[T]he debtor has
the right to bring suit because the debtor has the right to use
the property--the cause of action that came into the bankruptcy
estate." [Citations omitted.]); <u>In re Bowker</u>, 245 B.R. 192, 195-
96 (Bankr. D.N.J. 2000). <u>See also</u> <u>Crosby v. Monroe County</u>, 394
F.3d 1328, 1331 n.2 (11th Cir. 2004); <u>Olick v. Parker & Parsley</u>

---

[17]    The opinion is unpublished, but may be cited for its
persuasive authority under 10th Cir. R. 32.1(A).

Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998) (pointing to

legislative history to § 1303 as supporting conclusion that the

debtor has standing to sue on causes of action that are property

of the estate); 1 Keith M. Lundin, Chapter 13 Bankruptcy § 54.1

(3d ed. 2000 & Supp. 2004).  But see Davis v. Victor Warren

Props., Inc. (In re Davis), 216 B.R. 898, 903 (Bankr. N.D. Ga.

1997) (the § 363(b) power to use property of the estate "[has]

nothing to do with the Chapter 13 debtor's prosecution of a state

law cause of action."); Richardson v. United Parcel Serv., 195

B.R. 737, 739 (E.D. Mo. 1996).  With respect to the pursuit of

causes of action that are property of the estate, the chapter 13

trustee is relegated to an advisory role by 11 U.S.C. §

1302(b)(4) (directing the trustee to "advise, other than on legal

matters, and assist the debtor in performance under the plan"),

with the debtor being the entity enjoying the power of a trustee

under § 363 to pursue such causes of action.  See Ivy Tech, 200

F.3d at 472 & 475.

     The chapter 13 debtor may sue as representative of the

estate on a cause of action that became property of the estate

even though § 323 does not expressly vest a debtor with a

trustee's capacity to sue.  As noted in the legislative history

to § 323:

          Subsection (a) of this section makes the trustee the
          representative of the estate.  Subsection (b) grants
          the trustee the capacity to sue and to be sued.  If the
          debtor remains in possession in a chapter 11 case,

32

> section 1107 gives the debtor in possession these
> rights of the trustee: the debtor in possession becomes
> the representative of the estate, and may sue and be
> sued.  The same applies in a chapter 13 case.

H.R. Rep. No. 95-595, at 326 (1977), <u>as reprinted in</u> 1978

U.S.C.C.A.N. 5963, 6283; S. Rep. No. 95-989, at 37 (1978), <u>as

reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5824.  Having remained in

possession of the property of the estate, and being vested by

other provisions with a trustee's power to sue on causes of

action that are such property, the chapter 13 debtor implicitly

is vested with a trustee's capacity to sue on those causes of

action.  Congress viewed the chapter 13 debtor as exercising a

trustee's authority to sue when pursuing such causes of action.

Accordingly, a debtor in a chapter 13 case is entitled to

invoke § 363 with respect to the "use" of a cause of action that

is property of the estate.  The better reasoned decisions hold

that, in contrast to the provisions authorizing a chapter 13

debtor to pursue causes of action that are property of the

estate, none of the provisions of chapter 13 authorize a chapter

13 debtor to sue on a trustee's avoidance powers (under, for

example, 11 U.S.C. §§ 544 (unperfected liens), 547 (preferences),

or 548 (fraudulent conveyances)) other than pursuant to 11 U.S.C.

§ 522(h).[18]  Congress thought that it was inappropriate to permit
chapter 13 debtors, who are principally consumer debtors, to be
armed with avoidance powers, and decided that the avoidance
powers should remain vested in the chapter 13 trustee.  This
explains why Congress elected not to follow the approach of
chapter 12 of vesting the debtor with all the powers of a chapter
11 trustee until the debtor is displaced as a debtor in
possession, and instead resorted to different statutory language
for authorizing the debtor to invoke a trustee's power to sue on
claims that are property of the estate.  That explanation also
lends support to viewing the chapter 13 debtor as suing as a
trustee for purposes of § 108(a) when the debtor invokes a
trustee's powers under § 363 to sue on a cause of action that is
property of the estate.

     The difference in statutory structure also explains the
meaning of the statement in the legislative history to § 1303
that the debtor possesses certain powers "concurrently with the
trustee," and in particular the power to sue under § 323 despite

---

     [18]  See Knapper v. Bankers Trust Co. (In re Knapper), 407
F.3d 573, 583 (3d Cir. 2005); Estate Constr. Co. v. Miller &
Smith Holding Co., 14 F.3d 213, 220 (4th Cir. 1994); Stangel v.
United States (In re Stangel), 219 F.3d 498, 501 (5th Cir. 2000);
Hansen v. Green Tree Servicing, LLC (In re Hansen), 332 B.R. 8
(B.A.P. 10th Cir. 2005); but see Houston v. Eiler (In re Cohen),
305 B.R. 886, 897 (B.A.P. 9th Cir. 2004).

no mention being made of the debtor in § 323 or in § 1303.[19]  The

power to invoke § 323 is available to whichever entity, the

chapter 13 trustee or the chapter 13 debtor, who is vested with

the power to sue, and in that sense § 323 is a concurrently

shared power.  As to causes of action that became property of the

estate, only the debtor enjoys a trustee's powers to possess and

use such causes of action, and in exercising such powers only a

debtor may invoke a trustee's capacity under § 323 to sue on such

causes of action.  See In re Bowker, 245 B.R. 192, 193 (Bankr.

D.N.J. 2000) ("[I]n a chapter 13 bankruptcy case, it is the

debtor, and not the trustee, who has standing . . . to prosecute

litigation that is property of the estate.").  See also

Langenfeld v. Bank of America, N.A. (USA), 2007 WL 2034366, at

*3-4 (N.D. Okla. July 9, 2007); Jackson v. Marlette (In re

Jackson), 317 B.R. 573 (Bankr. D. Mass. 2004).  As to avoidance

power causes of action, however, only the chapter 13 trustee

---

[19]  In the floor statements to § 1303 it was stated:

> Section 1303 of the House amendment specifies rights
> and powers that the debtor has exclusive of the
> trustees.  The section does not imply that the debtor
> does not also possess other powers concurrently with
> the trustee. For example, although section 1323 [sic,
> presumably 323] is not specified in section 1303,
> certainly it is intended that the debtor has the power
> to sue and be sued.

124 Cong. Rec. H11106 (daily ed. Sept. 28, 1978) (remarks of Rep.
Edwards); S17423 (daily ed. Oct. 6, 1978) (remarks of Sen.
DeConcini).

enjoys a trustee's power to invoke avoidance powers, and thus to

enjoy a trustee's capacity to sue on such causes of action under

§ 323.   In other words, in chapter 13, the § 323 capacity to sue

may be invoked by whoever it is, the debtor or the chapter 13

trustee, who possesses a trustee's power under provisions of

other chapters of the Bankruptcy Code to sue on the cause of

action.   It is only in that sense that the chapter 13 trustee and

chapter 13 debtor can be said to possess the § 323 capacity to

sue concurrently.[20]

It being clear that in chapter 13, a debtor who is in

possession of a cause of action that is property of the estate

enjoys the powers of a trustee to sue on such a cause of action,

the critical issue is whether § 108(a) applies to a debtor's

exercise of such trustee powers.[21]   Section 1303 confers on a

chapter 13 debtor, to the exclusion of the chapter 13 trustee,

the power of a trustee under § 363 to pursue such a cause of

---

[20]   As discussed in <u>In re Bowker</u>, 245 B.R. 192, 198-200
(Bankr. D.N.J. 2000), various courts, including the Court of
Appeals in <u>Cable v. Ivy Tech State Coll. (In re Cable)</u>, 200 F.3d
467, 475 (7th Cir. 1999), have unnecessarily and erroneously
suggested that in chapter 13 the debtor and the trustee
concurrently hold the power to sue on a prepetition cause of
action that is property of the estate.

[21]   A chapter 11 or chapter 12 debtor in possession who
pursues an estate cause of action is vested (with exceptions of
no relevance here) with the powers of a chapter 11 trustee, and
can thus invoke § 108(a) as that provision applies to any trustee
under § 103(a).

action.[22]   Such a chapter 13 debtor who is prosecuting an estate

cause of action is viewed as exercising the powers of a trustee.

In Ivy Tech, the Court of Appeals held that in pursuing estate

causes of action, a chapter 13 debtor "steps into the role of

trustee" and exercises a trustee's power to represent the estate

under § 323.   Ivy Tech, 200 F.3d at 473.   As already discussed,

that is the view expressed as well in the House and Senate

Reports, and the floor statements addressing §§ 323 and 1303.[23]

Even though the term "use" in § 363 is construed as

including the trustee's power to sue on such a cause of action,

some courts have held that § 1303 confers on the debtor only the

_____

[22]   Section 363(b) requires notice and a hearing.   Although
there was no formal notice and a hearing before Dawson commenced
this adversary proceeding, the court held a scheduling conference
after the proceeding commenced.   That resulted in a scheduling
order which implicitly authorized the debtor's pursuit of the
cause of action.   No contention was raised that the debtor lacked
authority to pursue the cause of action.
    Had the defendants raised a statute of limitations defense
in their pretrial statement based on lack of notice and a hearing
under § 363(b), Dawson could have taken steps to satisfy the
requirement of notice and a hearing, if not already satisfied,
because the bankruptcy case was still pending.   This illustrates
the prejudice that Dawson would suffer were the defendants
allowed belatedly to assert the statute of limitations defense.

[23]   Although, because of § 1306(b), some decisions refer to
a debtor in chapter 13 as a "debtor in possession," that term is
not used in chapter 13, and the debtor's § 1306(b) powers should
not be treated as clothing a chapter 13 debtor with all of the
rights and powers conferred on a debtor in possession in cases
under chapters 11 and 12.   However, a chapter 13 debtor's
possession of the estate's prepetition causes of action
reinforces the debtor's enjoyment under §§ 1303 and 363 of a
trustee's power to use such property.

specified powers under § 363, not a trustee's rights under §
108(a) conferring on "the trustee" a lengthier statute of
limitations to sue on the cause of action.  See, e.g.,
Ranasinghe v. Compton (In re Ranasinghe), 341 B.R. 556, 567
(Bankr. E.D. Va. 2006).  However, when a chapter 13 debtor sues
on a cause of action that is property of the estate, he exercises
the rights of a trustee to sue *and* does so subject to the same
limitations as a trustee.

The § 363 power to sue, when exercised by a chapter 13
debtor, is exercised in the words of § 1303 as "a right[] and
power[] of a trustee" and "subject to the limitations on a
trustee under this chapter," meaning the limitations that would
apply to a chapter 13 trustee if the § 363 power were vested in
the chapter 13 trustee instead of the debtor.  That this is the
proper interpretation of the "subject to the limitations"
language is made clear by the legislative history to § 1303:

> A chapter 13 debtor is vested with the identical rights
> and powers, and is subject to the same limitations in
> regard to their exercise, **as those given a liquidation
> trustee** by virtue of section 363(b), (d), (e), (f), and
> (h) of title 11, relating to the . . . use . . . of
> property.

S. Rep. No. 95-989, at 140 (1978), as reprinted in 1978
U.S.C.C.A.N. 5787, 5926 (1978) (emphasis added).[24]

---

[24]  A "liquidation trustee" means a trustee in chapter 7
(the chapter entitled "Liquidation"): it is only a chapter 7
trustee that is required by § 704(1) to liquidate the property of
the estate.

The provision in § 108(a) addressing limitations on when a
trustee may exercise the § 363 power to sue necessarily applies
to whomever is exercising the trustee's § 363 power to sue.  This
is the better view of the statute.  When the Bankruptcy Code
confers on a party a power of a trustee found in one part of the
statute, the power carries with it the provisions of the statute
governing when and how the trustee may exercise that power.

If § 108(a) provided that a trustee must sue on causes of
action that are property of the estate only within 180 days after
the commencement of the case, regardless of any longer statute of
limitations available under nonbankruptcy law, there could be no
doubt that the chapter 13 debtor would be subject to the same
restriction, particularly because § 1303 provides that the debtor
in suing under § 363 is "[s]ubject to any limitations on a
trustee under . . . chapter [13] . . . ."  When the limitations
on a trustee are modified by § 108(a) (to enlarge the statute of
limitations), the debtor should similarly be subject to the same

modified limitations.[25]

In In re Ranasinghe, 341 B.R. at 567, the court acknowledged
that in suing on a cause of action that is property of the
estate, the debtor is utilizing a trustee's power of "use" under
§ 363 pursuant to the § 363 power conferred on the debtor by §
1303.  The court nevertheless held that the § 108(a) power is
implicitly negated because it is not one of the powers listed in
§ 1303.  However, the court failed to acknowledge that the
chapter 13 debtor's utilization of § 363 is "[s]ubject to any
limitation on a trustee," and thus includes the provisions of the
Bankruptcy Code that govern when a trustee may employ § 363.

This is not a question of conferring on the debtor a
trustee's power to sue that the Bankruptcy Code plainly does not
confer on the debtor.  See Hartford Underwriters Ins. Co. v.
Union Planters Bank, N.A., 530 U.S. 1, 13-14 (2000) (holder of

---

[25]  The provisions of 11 U.S.C. § 327 requiring court
approval of a trustee's employment of counsel do not apply to a
chapter 13 debtor's employment of professionals relating to the
debtor's exercise of a trustee's § 363 powers.  In re Tirado, 329
B.R. 244, 248-50 (Bankr. E.D. Wis. 2005); In re Gutierrez, 309
B.R. 488, 500-01 (Bankr. W.D. Tex. 2004).  It does not follow
that § 108(a) ought not apply either.  Section 327 is not a
statute specifically addressing a trustee's suing on causes of
action, and deals in general terms regarding a trustee's
employment of professionals.  In contrast, § 108(a) specifically
addresses a trustee's suing on causes of action that are property
of the estate, and can be read as modifying the limitations on a
trustee's power to sue under § 363 (and thus as modifying a
chapter 13 debtor's power under § 1303, subject to the same
limitations as imposed on a trustee, to sue under § 363).

administrative claim may not seek surcharge of a secured

creditor's collateral when § 506(c) vests the power to surcharge

in only the trustee); Stangel v. United States (In re Stangel),

219 F.3d 498, 501 (5th Cir. 2000) (trustee's avoidance power,

which is not property of the estate to which §§ 363 and 1303

apply,[26] was not conferred on a chapter 13 debtor except in the

limited circumstances specified by 11 U.S.C. § 522(h)).    In

Ranasinghe, 341 B.R. at 567, the court looked to Hartford

Underwriters and Stangel as requiring the conclusion that a

trustee's § 108(a) power is not conferred on the debtor because §

108(a) only mentions the trustee as clothed with the rights

conferred by that provision.    The Supreme Court in Hartford

Underwriters stated, with respect to a trustee's exclusive power

to surcharge a secured creditor under § 506(c), that:

> Several contextual features here support the conclusion that
> exclusivity is intended.    First, a situation in which a
> statute authorizes specific action and designates a
> particular party empowered to take it is surely among the
> least appropriate in which to presume nonexclusivity.
> "Where a statute ... names the parties granted [the] right
> to invoke its provisions, ... such parties only may act."
> 2A N. Singer, *Sutherland on Statutory Construction* § 47.23,
> p. 217 (5th ed. 1992) (internal quotation marks omitted);
> *see also Federal Election Comm'n v. National Conservative*

---

[26]    Pursuant to 11 U.S.C. § 541(a)(3), property that is the
subject of an avoided transfer becomes property of the estate
upon the property being recovered under, for example, 11 U.S.C. §
550.    The trustee's avoidance powers, and the trustee's power to
recover property that is the subject of an avoided transfer, are
not themselves property of the estate.    Accordingly, § 1306(b)
does not place a chapter 13 debtor in the possession of such
powers.

*Political Action Comm.*, 470 U.S. 480, 486, 105 S.Ct. 1459,
84 L.Ed.2d 455 (1985).  Second, the fact that the sole party
named--the trustee--has a unique role in bankruptcy
proceedings makes it entirely plausible that Congress would
provide a power to him and not to others.

....

Because we believe that by far the most natural reading of §
506(c) is that it extends only to the trustee, petitioner's
burden of persuading us that the section must be read to
allow its use by other parties is "'exceptionally heavy.'"
*Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 119
L.Ed.2d 519 (1992) ( *quoting Union Bank v. Wolas,* 502 U.S.
151, 156, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991)).

<u>Hartford Underwriters</u>, 530 U.S. at 6-7, 9.

However, <u>Hartford Underwriters</u> and <u>Stangel</u> involved the
issue of who had the power to sue (to either surcharge a
creditor's collateral or to avoid a transfer).  In contrast, the
power of a chapter 13 debtor to sue on estate causes of action
that became property of the estate on the petition date is
unquestioned, and the issues are different than in <u>Stangel</u> and
<u>Hartford Underwriters</u>.

The first issue is whether the provisions of § 108(a) govern
the statute of limitations for when a trustee may exercise the
trustee's powers under § 363.  The answer to that being in the
affirmative, the second issue is whether it follows that when
exercising a trustee's power to sue under § 363, a chapter 13
debtor may sue within the time that § 108(a) provides for the
trustee to sue.  The answer to that issue must similarly be in
the affirmative.  If a statute (here, § 1303) confers on an

42

entity another party's power to sue, expressly subject to the

same limitations as apply to that other party, one naturally

would look to the statutory provisions governing that power to

sue, including provisions (here, § 108(a)) that alter the statute

of limitations for suing.  Section 108(a) cannot be read in

isolation in deciding whether it is available to a chapter 13

debtor exercising a trustee's power to sue on estate causes of

action as statutory interpretation is a holistic exercise.[27]

A similar approach has been taken permitting a chapter 13

debtor to enforce 11 U.S.C. § 542(a), which provides with

exceptions of no relevance here:

> [A]n entity . . . in possession, custody, or control,
> during the case, of property that the trustee may use,
> sell, or lease under section 363 of this title . . .
> shall deliver to the trustee . . . such property or the
> value of such property . . . .

Courts have recognized that the chapter 13 debtor, by virtue of

his right to possess and use the property of the estate, may sue

to enforce the turnover obligation under § 542(a).  See TranSouth

---

[27] This court has on previous occasions acknowledged that a
plain meaning interpretation of § 108(a) read in isolation could
lead to absurd results if it were read as not applying to estate
representatives who pursue claims when acting as the functional
equivalent of a debtor-in-possession pursuant to the terms of a
confirmed Chapter 11 plan.  Alberts v. Tuft (In re Greater
Southeast Community Hospital Corp.), 333 B.R. 506, 535-36 (Bankr.
D.D.C. 2005).  In that case, the estate representative was a
successor to the debtor in possession's power of a trustee to
pursue estate claims.  Similarly, here, the chapter 13 debtor's
power to pursue estate claims derives from § 1303 which cloaks
the debtor with the powers of a trustee to use the property of
the estate and subject to the same limitations as a trustee.

43

Fin. Corp. v. Sharon (In re Sharon), 234 B.R. 676, 687 (B.A.P.

6th Cir. 1999):

> To the extent a Chapter 13 debtor can . . . use
> property of the estate under § 363, the debtor succeeds
> to the mandate in § 542(a) that compels delivery of
> property that is usable under § 363.  TranSouth's
> alternative reading produces an absurd result: § 542(a)
> would mandate delivery of a debtor's car to a Chapter
> 13 trustee who is prohibit[ed] by § 1306(b) to possess
> the car and is prohibited by § 1303 to use, sell or
> lease the car.

See also Coleman v. Grand Nat'l Bank (In re Coleman), 229 B.R.

428, 429-30 (Bankr. N.D. Ill. 1999).

Similarly, my interpretation of the statute is not a case of

enlarging § 108(a) to add the missing words "chapter 13 debtor"

to § 108(a), and this case is thus distinguishable from Lamie v.

U.S. Trustee, 540 U.S. 526, 538 (2004).  Instead, my

interpretation reads § 108(a) as modifying the limitations on a

trustee's powers under § 363, and as thus modifying the

limitations applicable to the powers of a chapter 13 debtor (who

by reason of § 1303 is subject to the same limitations) when

suing pursuant to the powers of a trustee under § 363.

Finally, § 108(a) applies in chapter 13 pursuant to 11

U.S.C. § 103(a), and it would be odd for the power to apply in

chapter 13 and yet, because of an overly narrow interpretation of

the Bankruptcy Code, for the power to be deprived of any utility

in chapter 13.

44

Although <u>Estate of Carr ex rel. Carr v. United States</u>, 482
F. Supp. 2d 842, 850 (W.D. Tex. 2007), suggests that a chapter 13
trustee can join in the pursuit of such a cause of action, this
ignores the limited powers of a chapter 13 trustee which, as
already discussed, have led the better reasoned decisions to
conclude that, in a chapter 13 case, only the debtor may sue on
causes of action that are property of the estate.   <u>See, e.g.</u>,
<u>Jackson v. Marlette (In re Jackson)</u>, 317 B.R. 573, 579 (Bankr. D.
Mass. 2004); <u>In re Bowker</u>, 245 B.R. 192, 198-200 (Bankr. D.N.J.
2000).   None of the duties imposed on a trustee under 11 U.S.C. §
1302(b) can be viewed as authorizing pursuit of causes of action
of the estate that, pursuant to § 1303, are subject to the
debtor's exclusive power to use under § 363.   Accordingly, if §
108(a) were unavailable to the chapter 13 debtor, it would fall
into a black hole of being unavailable to anyone to utilize
despite § 103(a) making it applicable in chapter 13.

In contrast, a trustee's avoidance powers under chapter 5 of
the Bankruptcy Code, which similarly are applicable in chapter 13
by virtue of § 103(a), remain available (at the very least) to
the chapter 13 trustee,[28] thus not falling into a black hole of
being unavailable for anyone to utilize should the avoidance

---

[28]   As noted earlier, the courts are divided over whether
the chapter 13 debtor may also sue pursuant to a trustee's
avoidance powers.

45

powers be held unavailable for the debtor to utilize.

Viewing § 108(a) in the context of other provisions of chapter 13 of the Bankruptcy Code, and because the chapter 13 debtor has exclusive authority to sue on the causes of action that are property of the estate, there are additional reasons to think that Congress could not have intended to bar the applicability of § 108(a) when a chapter 13 debtor sues on such causes of action.[29]  Among those reasons are these.  Congress did not intend to make creditors worse off in chapter 13 than in chapter 7.  <u>See</u> 11 U.S.C. § 1325(a)(4) (requiring that unsecured creditors receive in chapter 13 payments of a value equal to what they would receive in chapter 7).  Accordingly, when a cause of action would be available to a chapter 7 trustee at one point in time only by virtue of § 108(a), it is unlikely that Congress meant to treat the same cause of action as time-barred at the same point in time when the case has proceeded in chapter 13

---

[29]  Courts have rejected somewhat similar arguments when it comes to the issue of whether the debtor may pursue a trustee's avoidance powers.  But in contrast to claims that are property of the estate that the debtor has the exclusive power to use, a chapter 13 trustee plainly has the power to use the avoidance powers, and the arguments for allowing a chapter 13 debtor to utilize avoidance powers have been rejected as an attempt to rewrite the congressional decision to place the power to pursue avoidance actions in the hands of the chapter 13 trustee. Although a chapter 13 trustee may be reluctant to pursue avoidance causes of action, that problem is not a writ to re-write the statute to permit the debtor to pursue such causes of action.

instead.[30]

Indeed, Congress intended to encourage individuals to utilize chapter 13, devoting future disposable income to paying creditors, instead of utilizing a chapter 7 case in which creditors would often receive much less, if anything.  See, e.g., In re Lybrook, 951 F.2d 136, 137 (7th Cir. 1991); 11 U.S.C. § 707(b) (enacted after Lybrook, and providing for dismissal of a chapter 7 case that is a substantial abuse of chapter 7, but permitting the debtor to convert his case to chapter 13, in which § 707(b) is inapplicable, in order to avoid dismissal).  It is unlikely that Congress intended to reduce the amount that a debtor would be able to pay to creditors under a chapter 13 plan by making § 108(a) unavailable to the chapter 13 debtor.  The unavailability of § 108(a), in certain circumstances, can result in the debtor being forced to convert his case to chapter 7 in order to obtain bankruptcy relief because his inability to pursue an estate cause of action prevents him from proposing a

---

[30] Chapter 13 cases are available to only "an individual with regular income," 11 U.S.C. § 109(e), which is only "[an] individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13" as that term is defined under 11 U.S.C. § 101(30). Nevertheless, a chapter 13 debtor's recovery on a cause of action of the estate may serve as an additional source of income to supplement plan payments made by a debtor from regular income in a chapter 13 case, and a recovery on that cause of action may be the only way in which the debtor can propose a plan that complies with § 1325(a)(4).

confirmable chapter 13 plan.[31]

Moreover, an anomalous result would flow from depriving a chapter 13 debtor of § 108(a) rights.  If the debtor's action were not timely when filed because § 108(a) is unavailable, nevertheless, upon conversion to chapter 7, 11, or 12, the § 108(a) power would be available, even though the action was time-barred while in chapter 13.  If the debtor's pursuit of a claim, pursuant to exercising a trustee's powers under § 363, had already been dismissed as untimely while the bankruptcy case was in chapter 13, that dismissal would raise a vexing issue of whether the chapter 7 trustee is now barred from pursuing the claim even though the claim would be timely under § 108(a) had there not been a prior dismissal.  Congress did not likely intend to complicate the pursuit of estate causes of action in that fashion.

---

[31] For example, imagine a chapter 13 debtor who, when confirmation of his plan is being considered, is time-barred from pursuing an estate cause of action only because § 108(a) is held to be unavailable to him, and who has insufficient income to propose a plan making payments equal in value to the distribution that would be made to creditors by a chapter 7 trustee pursuant to a recovery on a pursuit by the chapter 7 trustee of the cause of action (via invoking § 108(a) to make pursuit of the cause of action timely).  By reason of § 1325(a)(4), the debtor's plan could not be confirmed if the debtor could not utilize § 108(a) because creditors would receive more in a chapter 7 case where the chapter 7 trustee could pursue the cause of action by invoking § 108(a).

V

APPLICABILITY OF 15 U.S.C. § 1602(aa) TO DAWSON'S LOAN

TILA and its implementing regulation, Regulation Z (12
C.F.R. §§ 226.1 - 226.36 (2000)), govern disclosure obligations
of creditors when they extend consumer credit.  See Clay v.
Johnson, 264 F.3d 744, 747 (7th Cir. 2001); 15 U.S.C. § 1638.
The stated purpose for enacting TILA was "to assure a meaningful
disclosure of credit terms so that [consumers] will be able to
compare more readily the various credit terms available to [them]
and avoid the uninformed use of credit, and to protect
[consumers] against inaccurate and unfair credit billing and
credit card practices." 15 U.S.C. § 1601(a).  See also Woolaghan
v. United Mortgage Servs., Inc. (In re Woolaghan), 140 B.R. 377,
382 (Bankr. W.D. Pa. 1992).  HOEPA, in turn, amended TILA in
response to increased reports of abusive home mortgage lending
practices.  Cooper v. First Gov't Mortgage & Investors Corp., 238
F. Supp. 2d 50, 54 (D.D.C. 2002).  HOEPA was intended to result
in greater disclosure to borrowers in connection with high cost
loans and to bring an end to certain loan terms and lending
practices.  Id. at 54.  Dawson asserts that 15 U.S.C. § 1602(aa),
one of the provisions added by HOEPA to TILA, is applicable here.

When § 1602(aa) applies, it triggers 15 U.S.C. § 1639 which
both requires that lenders provide borrowers with additional
disclosures beyond those that TILA generally requires, and bars

49

mortgages from containing certain terms.  Other than defending

against Dawson's TILA claims on the basis of the statute of

limitations defense already rejected, Thomas and Merwin have

defended on the basis that Dawson is estopped from raising her

TILA claims, implicitly conceding that except for these defenses,

Dawson has shown that the loan was subject to 15 U.S.C. §

1602(aa).  For the sake of completeness, parts A and B, below,

demonstrate, respectively, that the loan was subject to §

1602(aa) if it was a "consumer credit transaction," and that, as

implicitly conceded by the defendants, the loan was indeed a

"consumer credit transaction" subject to § 1602(aa).  Then, parts

C and D, below, reject the defendants' estoppel arguments that

are based on, respectively, Dawson's misrepresentations in

general, and the documents she signed at closing.

A.

THE LOAN IS SUBJECT TO 15 U.S.C.
§ 1602(aa) IF IT WAS A CONSUMER CREDIT TRANSACTION

Section 1602(aa)(1) provides:

A mortgage referred to in this subsection means a
consumer credit transaction that is secured by the
consumer's principal dwelling, other than a residential
mortgage transaction, a reverse mortgage transaction,
or a transaction under an open end credit plan, if--

    (A)  the annual percentage rate at consummation of the
         transaction will exceed by more than 10 percentage
         points the yield on Treasury securities having
         comparable periods of maturity on the fifteenth
         day of the month immediately preceding the month
         in which the application for the extension of

50

       credit is received by the creditor; **or**

    (B)  the total points and fees payable by the consumer at or before closing will exceed the greater of –

        (i)  8 percent of the total loan amount; **or**

        (ii)  $400.

15 U.S.C. § 1602(aa)(1) (emphasis added). Although § 1602(aa)(3) provides for annually adjusting the $400 amount specified in § 1602(aa)(1)(B)(ii) "by the annual percentage change in the Consumer Price Index," the $10,000 in fees charged Dawson obviously exceeded the $400 amount as thus adjusted.[32]

Thomas's loan to Dawson fits within the opening clause of the provision if the transaction was a "consumer credit transaction." The property securing the loan was Dawson's principal dwelling, and the transaction does not fall within any of the categories of transactions expressly excluded under § 1602(aa)(1) because the loan was not a "residential mortgage

---

[32] Because it is unnecessary to rely on § 1602(aa)(1)(A) to conclude that § 1602(aa) applied to Thomas's loan to Dawson, it is unnecessary to address § 1602(aa)(3) which provides for certain adjustments to the percentage points specified in § 1602(aa)(1)(A).

transaction" as that term is defined in § 1602(w),[33] and was not

an open-end credit plan or a reverse mortgage as defined,

respectively, in § 1602(i) and § 1602(bb).

Then, for Thomas's loan to Dawson, if it was a "consumer

credit transaction," to be covered by § 1602(aa), it suffices

under § 1602(aa)(1)(B)(i) that the total "points and fees"

payable by the consumer at or before closing will exceed the

greater of 8 percent of the total loan amount or $400.00 as

adjusted since HOEPA was enacted in 1994 for annual changes in

the Consumer Price Index.  Here, the "fees and points" associated

with this loan well exceeded the $400 amount as annually

adjusted, and are a sufficiently high percentage of the loan

amount to bring it within the purview of § 1602(aa)(1).  Pursuant

---

[33]  "The term 'residential mortgage transaction' means a
transaction in which a mortgage, deed of trust, purchase money
security interest arising under an installment sales contract, or
equivalent consensual security interest is created or retained
against the consumer's dwelling to finance the acquisition or
initial construction of such dwelling."  15 U.S.C. § 1602(w)
(emphasis added).  The loan at issue was obtained for purposes
other than the acquisition or construction of Dawson's dwelling,
and therefore does not fall within the statute's definition of
residential mortgage transaction.

to the definition of points and fees in § 1602(aa)(4),[34] both

Thomas's $5,000 lender's fee, see 12 C.F.R. 226.4(b)(3);[35] 12

C.F.R. 226.32(b)(i),[36] and Merwin's $5,000 broker fee, see 12

_____

[34] Pursuant to § 1602(aa)(4), the term "points and fees" in § 1602(aa)(1)(B) includes, in addition to certain other charges:

     (A) all items included in the finance charge, except interest or the time-price differential; [and]

     (B) all compensation paid to mortgage brokers[.]

Although a determination of which items to include in the calculation of points and fees is not always straightforward, see, e.g., Cooper v. First Gov't Mortgage & Investors Corp., 238 F. Supp. 2d 50 (D.D.C. 2002), in the instant case the size of Merwin's broker fee and Thomas's lender's fee obviate the need to determine which of the other fees and expenses charged in connection with this loan qualify as points and fees under § 1602(aa).

[35] 12 C.F.R. § 226.4(b) provides in pertinent part:

Example of finance charge. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:
. . .
     (3) Points, loan fees, assumption fees, finder's fees, and similar charges.
. . .

[36] In pertinent part, 12 C.F.R. § 226.32(b)(1) provides that the term "points and fees" includes:

     (i) All items required to be disclosed under § 226.4(a) and 226.4(b), except interest or the time-price differential; [and]
     (ii) All compensation paid to mortgage brokers[.]

C.F.R. § 226.4(a)(3);[37] 12 C.F.R. 226.32(b)(1)(ii),[38] are finance charges and thus "fees" to which § 1602(aa)(1)(B) applies. Without even taking into account the various other charges that were imposed incident to this loan and that may also qualify as points and fees, the broker's fee together with Thomas's lender's fee amount to $10,000, exceeding, on their face, 28% of the total loan amount.

Thus, the applicability of § 1602(aa) to the instant transaction turns on whether Dawson has shown that the transaction was a "consumer credit transaction" within the meaning of § 1602(aa).  As explained in more detail below, the loan was, in fact, a consumer credit transaction, and it was therefore subject to the disclosure requirements of HOEPA absent a valid estoppel defense.

---

[37]   12 C.F.R. § 226.4(a) provides in pertinent part:

Definition.  The finance charge is the cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.
. . .
        (3) Special rule; mortgage broker fees.  Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

[38]   See supra note 36.

B.

THE LOAN WAS A "CONSUMER CREDIT TRANSACTION" EVEN IF THE PROCEEDS
OF THIS LOAN RELATING TO THE DEBTOR'S PRINCIPAL RESIDENCE
WERE USED IN PART TO STOP A FORECLOSURE SALE OF THE
PROPERTY AND TO RENOVATE THE PROPERTY TO BE ABLE TO SELL IT

The meaning of "consumer credit transaction" is explained by

15 U.S.C. § 1602(h):

> The adjective "consumer", used with reference to a
> credit transaction, characterizes the transaction as
> one in which the party to whom credit is offered or
> extended is a natural person, and the money, property,
> or services which are the subject of the transaction
> are primarily for personal, family, or household
> purposes.

As found earlier, Dawson borrowed the money primarily for the

purpose of saving her home from foreclosure, which would seem to

make this a "consumer credit transaction," at least when Dawson's

actual reasons for the loan are the focus.  However, pointing to

representations that Dawson made to them, the defendants contend

that the loan is not a consumer credit transaction and is exempt

under 15 U.S.C. § 1603(1) as having been made "primarily for a

business, commercial or agricultural purpose."  15 U.S.C. §

1603(1).

Although Dawson and the defendants disagree on whether the

loan was obtained primarily for a business or personal purpose,

they do agree that of the $35,000 loan, $8,629.77 was intended

and was in fact used to reinstate the first deed of trust and

prevent a foreclosure sale of the house, that $12,163.47 of the

loan amount was attributable to settlement charges and fees, and
that the remaining $14,206.76 that was disbursed to Dawson was
used by her for an unspecified personal purpose.  The defendants
contend that, notwithstanding how the debtor actually used the
$14,206.76, Dawson represented that those funds would be used to
renovate the property in anticipation of sale, and that the
defendants reasonably relied upon that representation in treating
the loan as one for commercial and business purposes.

The case law does not support and this court rejects the
argument that this loan was obtained for primarily business
purposes merely because Dawson sought to halt the foreclosure
sale of a property in which she occasionally rented out rooms.
The primary motivation and purpose for obtaining the instant loan
was the personal purpose of preventing the foreclosure sale of
Dawson's primary residence.  See Anderson v. Lester, 382 So. 2d
1019, 1023-25 (La. Ct. App. 1980) (loan obtained to prevent
foreclosure sale of primary residence held to be obtained
primarily for personal purposes even though foreclosure was
halted by using the loan to pay business debts).

The defendants also contend that the property was rental
property, and that a loan obtained to reinstate the first deed of
trust as to such investment property constitutes a business
purpose.  The incidental rental of rooms in Dawson's home does
not convert the otherwise personal purpose for obtaining the loan

56

into a commercial purpose.  <u>Gerasta v. Hibernia Nat'l Bank</u>, 411
F. Supp. 176 (E.D. La. 1976), <u>aff'd in part</u>, <u>rev'd in part</u>, 575
F.2d 580 (5th Cir. 1978) (loan obtained for the purpose of making
improvements on borrower's property obtained for personal rather
than business purposes if borrower intends to live in the
property after improvements are complete, even if part of the
property is and will continue to be occupied by renters).  This
was Dawson's primary residence, and not an investment property.

       Assuming without deciding that Dawson intended to renovate
the property for purposes of sale (or is chargeable with her
stated intention to do so), the court is nevertheless faced with
the argument that a loan obtained for the purpose of halting a
foreclosure sale on a borrower's primary residence with a
concomitant purpose of renovating and selling the property
converts the would-be personal purpose of preventing the
foreclosure sale of one's primary residence into a business and
commercial purpose of allowing for the orderly sale of the home
such that the borrower can realize the full value of her
unencumbered equity in the property.  The court rejects this
argument.  To characterize the loan at issue as having a
primarily business or commercial purpose on such basis requires a
tortured interpretation of the facts and an equally implausible
reading of the statute.  Dawson did not convert her primary
residence into investment property even if she did intend to use

57

a portion of the loan proceeds for renovations which would in turn facilitate a sale. The court finds that what Dawson intended to do after preventing foreclosure was secondary to her primary motivation of preventing the foreclosure sale of her primary residence. In any event, a homeowner who borrows funds to improve a home that is her principal residence acts as a consumer, and not for commercial or business purposes, even if the funds are to be used to repair the home in order to facilitate a sale of the property.

The court having found that the loan was a consumer credit transaction within the meaning of HOEPA and TILA, and having already found that the loan otherwise qualifies as a loan governed by those statutes, the court holds that the loan is subject to the disclosure requirements of and the restrictions imposed by TILA and HOEPA, unless Dawson is estopped from contending that the transaction was a consumer credit transaction.

C.

THE DEFENDANTS DID NOT REASONABLY RELY
UPON ANY OF DAWSON'S STATEMENTS THAT ALLEGEDLY
MISLED THE DEFENDANTS INTO BELIEVING THAT THE LOAN
WAS A COMMERCIAL RATHER THAN A CONSUMER TRANSACTION

Thomas complains that he and Merwin were misled by Dawson into believing that the loan was being obtained for a commercial purpose, and that Dawson is estopped from now asserting that the

loan was a consumer loan obtained for personal purposes.  To
invoke the equitable doctrine of estoppel, the defendants must
establish that Dawson made a definite representation upon which
they reasonably relied to their detriment.  <u>Graham v. SEC</u>, 222
F.3d 994, 1007 (D.C. Cir. 2000).  In the instant case, the
defendants have failed to demonstrate that any reliance upon
Dawson's alleged misrepresentations was reasonable.

The Official Commentary to Regulation Z provides that
lenders "must determine in each case if the transaction is
primarily for an exempt purpose."  12 C.F.R. Pt. 226, Supp. I, §
226.3(a)(1).  The Official Commentary is published by the Board
of Governors of the Federal Reserve System and the interpretation
of Regulation Z contained therein "is dispositive in TILA cases
unless the commentary is demonstrably irrational."  <u>Clay v.
Johnson</u>, 264 F.3d 744, 748 (7th Cir. 2001); <u>Ford Motor Credit Co.
v. Milhollin</u>, 444 U.S. 555, 566 (1980) ("Congress delegated broad
administrative lawmaking power to the Federal Reserve Board when
it framed TILA [and] [t]he Act is best construed by those who
gave it substance in promulgating regulations thereunder.").
Although the Commentary does not specify the procedure for
determining the primary purpose of a loan and by extension the
applicability of the exemption, it does provide that "[i]f some
question exists as to the primary purpose for a credit extension,
the creditor is, of course, free to make the disclosures, and the

59

fact that disclosures are made under such circumstances is not
controlling on the question of whether the transaction was
exempt." 12 C.F.R. Pt. 226, Supp. I, § 226.3(a)(1).  Thus, under
the Board's interpretation, creditors have an affirmative duty to
determine the applicability of the exemption, and in cases of
uncertainty, they are expressly invited to make the disclosures.[39]

When a sophisticated borrower takes deliberate and
calculated steps to mislead a lender into believing that a loan
is being obtained for commercial purposes, the borrower is not
entitled to later invoke the protections of TILA based upon an
assertion that, notwithstanding what the lender was led to
believe, the loan was actually obtained for personal purposes.
See Conrad v. Smith, 712 P.2d 866 (Wash. Ct. App. 1986).
Although the court agrees that a borrower's statement of purpose
is relevant to a determination of whether a loan is being
obtained for a business or consumer purpose, the reliability and

---

[39]  When cross-examining Dawson's expert with respect to the
standard of care applicable to brokers and lenders when
processing a loan, counsel for the defendants made much of the
fact that the defendants in this case were faced with unique time
pressures attributable to the imminent foreclosure sale of
Dawson's house.  Implicit in this line of inquiry was the notion
that a lender's duty to make a reasonable inquiry into the
purpose of a loan can be altered by time constraints.  The
Official Commentary supports the opposite conclusion, to wit, if
sufficient time is not available to collect reliable information
concerning the purpose of a loan, the lender should err on the
side of disclosure rather than rely upon inadequate or incomplete
information to erroneously conclude that the disclosure
requirements are inapplicable.

plausibility of such statements must also be taken into
consideration.

In Conrad, a case addressing the rights of lenders when
borrowers misrepresent the purpose of a loan, the borrower made
numerous representations to the lender during the loan process
regarding the purpose of the loan with the "apparent intention of
obfuscating matters." Id. at 566. In determining that the loan
was for a business rather than a consumer purpose, the Conrad
court found it relevant that the borrower, whose representations
contributed to the lender's belief that the loan was for a
business purpose, had a background that included "2 years of
college and knowledge of the TILA through his occupation as a
siding salesman. . . ." Id. at 868. Furthermore, the borrower
in Conrad testified that he intentionally did not seek to have
deleted a provision stating that the loan was for a business
purpose "[b]ecause that was the only way I could get the loan,
and I was desperate." Id. at 869.

The instant case is easily distinguishable from cases such
as Conrad. Dawson is far from sophisticated and any effort to
mislead the defendants was poorly executed at best. Thomas and
Merwin were not entitled to selectively rely upon unconfirmed and
unsubstantiated verbal statements regarding the nature of the
property securing a loan and the purpose for which the loan was
being acquired when such statements did not comport with reality

61

(as would have been revealed by a modicum of due diligence to attempt to verify whether Dawson's representations were accurate)[40] and were expressly contradicted in the instrument consummating the loan.[41]  This is especially true when lenders intend to rely upon such statements in asserting that a transaction is exempt from the disclosure requirements of TILA.

The court need not decide the more difficult question of how it would treat a loan arising from a sophisticated borrower's clever and calculated deception of a lender, or how it would treat a loan arising from a collusive arrangement between equally sophisticated parties who together determine to disregard the

---

[40]  At trial, both defendants demonstrated a familiarity with predatory lending legislation and acknowledged the importance of verifying that residential property being used to secure a commercial loan is not owner-occupied. Even with the time constraints imposed by the pending foreclosure sale, the defendants should - at a minimum - have obtained some form of written verification that Dawson was not living at the Property or that the Property was non-owner-occupied rental property. There was, after all, sufficient time to run a title check and to confirm that there was enough equity in the property to secure the loan.  The court finds that there was likewise sufficient time to request and require to be produced by Dawson at least one document - however simple - confirming Dawson's living arrangement or confirming that the tenant believed to be living at the property was the exclusive occupant of the premises.  The defendants did not even secure a scrap of paper identifying Dawson's supposed alternate address.  Even if the defendants satisfied themselves, under their own standards, that the Property was non-owner-occupied rental property, an objective standard of reasonableness called for something more.

[41]  As stated in the court's recitation of the basic facts, the settlement agent's knowledge that the property was Dawson's primary residence is imputed to Thomas.

true purpose of a loan in favor of calling it a commercial loan, because here Dawson's lack of sophistication should have been evident and should have put both defendants on notice that they would need more than Dawson's unsubstantiated verbal statements to support a determination that the transaction was exempt. It was Thomas's duty to make an inquiry reasonably calculated to lead to an accurate determination of whether the Property was Dawson's primary residence or exclusively a rental property.[42] To the extent Thomas had no actual knowledge that the Property was Dawson's primary residence rather than investment property, he had a duty to make further inquiry, and he cannot assert an estoppel defense based upon his lack of knowledge that resulted from his and Merwin's failure to make such inquiry.

Accordingly, the court rejects the defendants' estoppel argument because neither defendant could have reasonably relied upon Dawson's allegedly misleading statements to conclude that the transaction was exempt from the disclosure requirements of TILA.

---

[42] Although the facts reflect that Merwin was equally responsible for the inadequacy of the investigation into the purpose of the loan and contributed to Thomas's stated belief that the Property was not owner-occupied, Thomas, as the lender, had the ultimate duty to ensure that the loan complied with state and federal law.

D.

THE AFFIDAVIT OF BUSINESS PURPOSE AND
RELATED LOAN DOCUMENTS DO NOT ESTABLISH
WHETHER THE LOAN WAS FOR A PERSONAL OR BUSINESS PURPOSE

The court gives little weight to the business purpose affidavit and related documents signed by Dawson at settlement in determining whether Dawson entered into a commercial loan transaction.  It is well-established that an affidavit stating that a loan is for a business purpose is not legally conclusive as to the purpose of that loan.  Indeed, "[t]he business or personal nature of [a] loan is a factual question to be answered after evaluating the circumstances surrounding the transaction." McGovern v. Smith, 801 P.2d 250, 256 (Wash. Ct. App. 1991).  The same principle holds true with respect to the other documents purporting to put Dawson on notice that she was engaging in a commercial rather than a consumer transaction.  The instrument consummating the loan may have included provisions that gave it the superficial appearance of a commercial loan, yet the court finds that the inclusion of such provisions was insufficient to overcome the true character of the loan as a consumer loan.  As in the case of other representations made by Dawson (and when combined with those other representations), the business purpose affidavit and related closing documents do not suffice to establish that equitable estoppel should apply (particularly when other closing documents raised red flags regarding the true

64

character of the loan and, as discussed in part C, above, when

the defendants performed an inadequate investigation into the

true character of the loan).

VI

MERWIN IS NOT A CREDITOR AND IS
THEREFORE NOT SUBJECT TO LIABILITY UNDER TILA

Only "creditors" are subject to liability under TILA, 15

U.S.C. §§ 1601 - 1667f (2000).  The term creditor as used in

TILA:

> refers only to a person who both (1) regularly extends,
> whether in connection with loans, sales of property or
> services, or otherwise, consumer credit which is
> payable by agreement in more than four installments or
> for which the payment of a finance charge is or may be
> required, and (2) is the person to whom the debt
> arising from the consumer credit transaction is
> initially payable on the face of the evidence of
> indebtedness or, if there is no such evidence of
> indebtedness, by agreement . . . .  Any person who
> originates 2 or more mortgages referred to
> in subsection (aa) of this section in any 12-month
> period or any person who originates 1 or more such
> mortgages through a mortgage broker shall be considered
> to be a creditor for purposes of this subchapter.

15 U.S.C. § 1602(f).[43]   Thomas was a creditor if he originated a
mortgage that is "referred to in [§ 1602(aa)] through a mortgage
broker."   As earlier concluded, Dawson's loan transaction was a
mortgage described in § 1602(aa).   In addition, Merwin acted as
Dawson's mortgage broker with respect to the loan.   Accordingly,
Thomas meets the definition of a "creditor" pursuant to 15 U.S.C.
§ 1602(f), and is subject to liability as a creditor under TILA.

Dawson has not, however, shown that Merwin is a creditor
within the meaning of TILA.   She has not shown that the loan was
originally payable to Merwin, that Merwin regularly extends
consumer credit, or that Merwin otherwise qualifies as a creditor
under TILA.   Dawson having failed to show that Merwin is a

---

[43]   Regulation Z also confirms that the last sentence of
this provision, which was added as part of the HOEPA amendments,
see 60 Fed. Reg. 15463, 15464 (1995), was intended to expand what
it means to regularly extend credit.   Specifically, Regulation Z
states:

A person regularly extends consumer credit only if it
extended credit (other than credit subject to the
requirements of § 226.32) more than 25 times (or more
than 5 times for transactions secured by a dwelling) in
the preceding calendar year.   If a person did not meet
these numerical standards in the preceding calendar
year, the numerical standards shall be applied to the
current calendar year.   **A person regularly extends
consumer credit if, in any 12-month period, the person
originates more than one credit extension that is
subject to the requirements of § 226.32 or one or more
such credit extensions through a mortgage broker.**
[Emphasis added.]

12 C.F.R. § 226.2(a)(17)(i) n.3.   See also Viernes v. Executive
Mortgage, Inc., 372 F. Supp. 2d 576, 581 (D. Haw. 2004) (quoting
and discussing 12 C.F.R. § 226.2(a)(17) (i)).

creditor, Merwin is not subject to liability under TILA in connection with this loan. <u>Wilson v. Homecomings Fin. Network, Inc.</u>, 407 F. Supp. 2d 893, 896 (N.D. Ohio 2005); <u>Viernes v. Executive Mortgage, Inc.</u>, 372 F. Supp. 2d 576, 580-82 (D. Haw. 2004) (discussing TILA's definition of "creditor" and concluding that the defendant mortgage broker was not a creditor within the meaning of TILA because broker did not regularly extend consumer credit and was not the person to whom obligation was initially payable); <u>Robey-Harcourt v. BenCorp Fin. Co.</u>, 326 F.3d 1140, 1142 (10th Cir. 2003) (broker not creditor within meaning of TILA because it did not regularly extend credit and was not the party to whom obligation was initially payable); <u>DeLeon v. Beneficial Constr. Co.</u>, 55 F. Supp. 2d 819, 828 (N.D. Ill. 1999) (finding that a construction company that referred its client to a broker to secure financing did not qualify as a creditor under TILA's two-prong test); <u>Moore v. Flagstar Bank</u>, 6 F. Supp. 2d 496, 501 (E.D. Va. 1997) (party that prepared form documents used in transaction did not qualify as a creditor under TILA's two-part test); <u>Noel v. Fleet Fin., Inc.</u>, 971 F. Supp. 1102, 1109 (E.D. Mich. 1997) (comparing non-creditor brokers and agents with true creditors who are directly involved in financing and to whom the

obligation in question is initially payable).[44]


VII

THOMAS IS LIABLE FOR VIOLATING TILA

Having determined that the loan is a consumer credit

transaction subject to the requirements of TILA, and that Thomas

is a creditor subject to liability under TILA, including its

HOEPA amendments, the court now considers the question of

Thomas's liability under those provisions.  The defendants having

consistently taken the position that TILA and HOEPA are

inapplicable to the transaction rather than alleging compliance,

it is no surprise that a finding that the loan was a consumer

credit transaction carries with it a corresponding finding that

_____

[44]  As explained in DeLeon v. Beneficial Constr. Co., 55 F.
Supp. 2d 819 (N.D. Ill. 1999), although TILA's definition of a
creditor originally "also included any person who regularly
'arrange[d] for the extension of credit,' see 15 U.S.C. § 1602(f)
(1981), in 1982 Congress deleted the 'arrange' clause,
substituting instead part (2) of the present subsection (f) . . .
." DeLeon, 55 F. Supp.2d at 828; Regulation Z, 12 C.F.R. 226,
Supplementary Information to Final Rule and Final Official Staff
Interpretation (April 6, 1983)("Section 103(f) of the Truth in
Lending Act was amended by deleting "arrangers of credit" from
the definition of "creditor," effective October 1, 1982 . . .
."). This explains why cases decided under the pre-1982 statute
conclude, contrary to current law, that brokers are creditors
within the meaning of TILA.  See, e.g., Phillips v. Dukes (In re
Dukes), 24 B.R. 404, 416 (Bankr. E.D. Mich. 1982) ("As a matter
of law, [the defendant] is a broker who obtains loans for its
clients from lenders, an arranger for the extension of consumer
credit, and is therefore a creditor under Regulation Z . . . .");
McGowan v. Credit Ctr. of N. Jackson, Inc., 546 F.2d 73, 75 (5th
Cir. 1977) (both the broker and the lender are creditors under
1969 version of the Truth-in-Lending Act).

Thomas violated the provisions of TILA and the HOEPA amendments.

A.

THE LOAN INCLUDED TERMS PROHIBITED UNDER TILA AND
THOMAS FAILED TO MAKE THE REQUISITE DISCLOSURES UNDER TILA

Loans subject to § 1602(aa) are prohibited from including

terms that provide, _inter_ _alia_, for higher interest rates after

default or for balloon payments if the term of the loan is less

than 5 years.  15 U.S.C. § 1639(d), (e).[45]  The defendants concede

that the loan contains both of these prohibited provisions.

HOEPA also prohibits lenders from extending loans subject to

the requirements of HOEPA "without regard to the consumers'

repayment ability, including the consumers' current and expected

income, current obligations, and employment." 15 U.S.C. § 1639

(h).  The defendants made no attempt to verify the employment

status or income level of Dawson and Thomas's failure to do so

constitutes a further violation of TILA.

In addition to violating the HOEPA amendments to TILA,

Thomas also violated the general provisions of TILA, which

require lenders to make numerous disclosures, most if not all of

which Thomas concedes were not made.  The finding of even one

violation of TILA, no mater how technical, gives rise to

---

[45]  The amended complaint further alleges that the loan
violated HOEPA because it provided for negative amortization.
Although the scheduled payments were interest-only, the evidence
suggests that they provide for non-amortization rather than
negative amortization.

liability.   See Porter v. Mid-Penn Consumer Disc. Co. (In re

Porter), 961 F.2d 1066, 1078 (3d Cir. 1992) ("TILA achieves its

remedial goals by a system of strict liability in favor of the

consumers when mandated disclosures have not been made.   A

creditor who fails to comply with TILA in any respect is liable

to the consumer under the statute regardless of the nature of the

violation or the creditor's intent.   Once the court finds a

violation, no matter how technical, it has no discretion with

respect to liability." (Internal quotations and citations

omitted.)).

B.

RESCISSION

TILA requires that a borrower's rescission rights be clearly

and conspicuously disclosed by the lender in accordance with

regulations promulgated by the Board.   15 U.S.C. § 1635(a).   A

borrower's right to rescind expires after three days unless the

lender failed to provide the requisite notice and disclosures, in

which case the borrower has three years to rescind the loan.   15

U.S.C. § 1635 (a),(f).   Thomas does not dispute that he failed to

make the requisite disclosures relating to Dawson's right to

rescind.   Accordingly, Dawson had three years in which to rescind

the transaction.

The record reflects that Dawson's only rescission "demand"

was made by way of the complaint.   The complaint having clearly

70

expressed Dawson's intent to rescind, the court finds that

service of the complaint on Thomas constituted notice of

rescission under § 1635.  See Jackson v. U.S. Bank Nat'l Ass'n

Tr., 245 B.R. 23, 33 (Bankr. E.D. Pa. 2000) (awarding damages for

creditor's refusal to effect a rescission that was demanded by

way of a complaint).

The procedure for undoing a transaction after a borrower

exercises her right to rescind is set forth in 15 U.S.C. §

1635(b), which provides as follows:

> When an obligor exercises his right to rescind under
> subsection (a) of this section, he is not liable for
> any finance or other charge, and any security interest
> given by the obligor, including any such interest
> arising by operation of law, becomes void upon such a
> rescission.  Within 20 days after receipt of a notice
> of rescission, the creditor shall return to the obligor
> any money or property given as earnest money,
> downpayment, or otherwise, and shall take any action
> necessary or appropriate to reflect the termination of
> any security interest created under the transaction.
> If the creditor has delivered any property to the
> obligor, the obligor may retain possession of it.  Upon
> the performance of the creditor's obligations under
> this section, the obligor shall tender the property to
> the creditor, except that if return of the property in
> kind would be impracticable or inequitable, the obligor
> shall tender its reasonable value.  Tender shall be
> made at the location of the property or at the
> residence of the obligor, at the option of the obligor.
> If the creditor does not take possession of the
> property within 20 days after tender by the obligor,
> ownership of the property vests in the obligor without
> obligation on his part to pay for it.  The procedures
> prescribed by this subsection shall apply except when
> otherwise ordered by a court.

As a preliminary matter, the court determines that,

notwithstanding § 1635(b), Dawson's attempted exercise of her

71

right of rescission did not automatically void Thomas's security

interest or in any way modify the debt owed by Dawson to Thomas.

Dawson's right to rescission was subject to legitimate dispute in

this litigation, and Thomas was under no obligation to honor

Dawson's request until this court determined that Dawson actually

possessed a right of rescission.  See Am. Mortgage Network, Inc.

v. Shelton, 486 F.3d 815 (4th Cir. 2007) ("The natural reading of

[§ 1635(b)] is that the security interest becomes void when the

obligor exercises a right to rescind that is available in the

particular case, either because the creditor acknowledges that

the right of rescission is available, or because the appropriate

decision maker has so determined . . . .  Until such decision is

made, the [borrowers] have only advanced a claim seeking

rescission." (quoting Large v. Conseco Fin. Servicing Corp., 292

F.3d 49, 54-55 (1st Cir. 2002), and rejecting the minority

position adopted by the Eleventh Circuit in Williams v. Homestake

Mortgage Co., 968 F.2d 1137, 1141-42 (11th Cir. 1992), that

rescission is automatic).  Accordingly, the court finds that

Thomas is not subject to liability for failing to rescind the

transaction prior to this court's determination that Dawson is

entitled to rescission.  Accordingly, Dawson's request for

attorney's fees and $2,000 in statutory damages under 15 U.S.C. §

1640(a)(2)(A)(iii) based upon Thomas's failure to rescind the

transaction in conformity with TILA is denied.[46]

Second, the court determines that, notwithstanding the
court's finding that Dawson is entitled to rescission, to the
extent Dawson still wishes to exercise her right of rescission,
the court will require Dawson to return to Thomas the proceeds of
the loan before requiring that Thomas void his security interest
in Dawson's real property.

The court is mindful that the express language of TILA
contemplates that, unless the court orders otherwise, after a
borrower notifies a creditor of its intent to exercise its right
to rescission, the borrower may retain possession of the
creditor's property until the lender has taken the necessary
steps to void the security interest.  The TILA rescission remedy,
however, despite being statutorily granted, "remains an equitable
doctrine subject to equitable considerations."  Brown v. Nat.
Permanent Fed. Sav. & Loan Assoc'n, 683 F.2d 444, 447 (D.C. Cir.
1982).  Recognizing that rescission is an equitable remedy, the
court of appeals for this circuit has twice concluded that,
notwithstanding that TILA does not make the borrower's return of
funds a prerequisite to rescission under TILA, the trial court
has the equitable power to condition rescission upon the return

---

[46] As will be seen, however, such damage remedies are
available for other violations, and Dawson is entitled to recover
her attorney's fees and the maximum of $2,000 in statutory
damages.

of the loan proceeds to the lender.    See id. at 447, 449

(reaching that conclusion even under a prior version of § 1635(b)

that did not include the last sentence authorizing the court to

alter the procedures of rescission); Etta v. Seaboard Enters.,

Inc., 674 F.2d 913, 919 (D.C. Cir. 1982) (same).[47]

At the time of trial, Dawson was in bankruptcy and had

already exhausted all of the proceeds from the loan.    The court

is skeptical of Dawson's ability to return the loan proceeds,

unless she were to sell her home, and it would be inequitable to

require Thomas to terminate his security interest in Dawson's

property if Dawson refuses to take that step in order to raise

the funds necessary to fulfill her reciprocal duty to return the

loan proceeds to Thomas and otherwise has no ability to effect

such a return.    It is "[t]he equitable goal of rescission under

---

[47] See also  Yamamoto v. Bank of New York, 329 F.3d 1167,
1171 (9th Cir. 2003) ("A trial judge ha[s] the discretion to
condition [TILA] rescission on tender by the borrower of the
property he had received by the lender . . . . [W]hether a decree
of rescission should be conditional depends upon the equities
present in a particular case . . . ." (internal quotations and
citations omitted)); Stanley v. Household Fin. Corp. III (In re
Stanley), 315 B.R. 602, 615 (Bankr. D. Kan. 2004) (voiding of
security interest is one of rescission procedures under TILA and
can be equitably modified, by requiring payment of loan proceeds
as a condition, and Regulation Z § 226.23(d)(4), which provides
to the contrary, is an impermissible construction of TILA §
1635(b)); Quenzer v. Advanta Mortgage Corp. USA, 288 B.R. 884,
888 (D. Kan. 2003).  But see, e.g., Williams v. BankOne, N.A. (In
re Williams), 291 B.R. 636, 657-58 (Bankr. E.D. Pa. 2003) ("The
language of § 1635(b) and Regulation Z as supported by the
legislative history to § 1635(b) informs that, while courts can
modify the procedures set forth in § 1635(b), they cannot modify
the voiding of a creditor's security interest.").

TILA . . . to restore the parties to the 'status quo ante,'"
Shelton, 486 F.3d at 820, and conditioning Thomas's duty to
terminate his security interest only upon Dawson's return of the
loan proceeds is consistent with that goal.  To the extent that
the court must consider all of the equities in the case in
deciding whether to so condition rescission, the equities weigh
in favor of doing so.  Dawson's house was already encumbered by a
deed of trust that was brought current only by reason of Thomas's
advancing funds to reinstate the note secured by that deed of
trust, thereby reducing that mortgage obligation on her property
in a like amount.  In addition, the other funds borrowed by
Dawson from Thomas were borrowed for the purpose of improving the
home.  Although Thomas, through his own actions and through
Merwin's actions on his behalf, acted recklessly in not
reasonably ascertaining whether the loan was actually being
obtained for a commercial purpose, Thomas will be subjected to
statutory damages, an elimination of all finance charges, and an
award to Dawson of her attorney's fees.  That will serve to
punish his misconduct.  Moreover, Dawson was not blameless in the
transaction, having made false representations to Merwin
regarding where she resided.  In the District of Columbia, an
individual may exempt her entire principal residence.  D.C. Code
§ 15-501(a)(14) (2001 & Supp. 2005).  Although § 15-501(a)(14)
was enacted in 2001, well before the transaction in the year 2003

75

at issue here, the result of that provision would be to strip
Thomas of any likelihood of recovery if his security interest is
voided without requiring Dawson's repayment of what she received
in the transaction as a condition to the voiding of the security
interest, a windfall not justified by the equities of this case.

Accordingly, Thomas will be required within 20 days after
entry of this decision to deposit in the registry of the court a
release of his deed of trust, but that release may recite that it
is effective only when the original is recorded with the Recorder
of Deeds of the District of Columbia.  Once Dawson has performed
her reciprocal duty to return the net loan proceeds she received
to Thomas, the court will direct the clerk to deliver the release
to Dawson and, because § 1635(b) contemplates that the lender is
the party required to take steps "to reflect the termination of
[the] security interest," the court will additionally direct that
Thomas, upon receiving all of the net loan proceeds from Thomas,
shall file a duplicate signed original with the Recorder of
Deeds.

Once a court determines that rescission is appropriate, the
court may allow the borrower a time certain to tender the net
loan proceeds.  American Mortgage Network, Inc. v. Shelton, 486
F.3d at 821.  Bearing in mind that rescission is an equitable
remedy, and that Thomas woefully neglected his duties under TILA,
it is appropriate to give Dawson a reasonable period of time

76

within which to tender the net loan proceeds.  Some courts

permit a borrower to repay the net loan proceeds in installments.

See, e.g., Sterten v. Option One Mortgage Corp. (In re Sterten),

352 B.R. 380, 387-88 (Bankr. E.D. Pa. 2006), rev'd on other

grounds, 479 F. Supp. 2d 479 (E.D. Pa. 2007); Mayfield v.

Vanguard Sav. & Loan Ass'n, 710 F. Supp. 143 (E.D. Pa. 1989)

(borrower given almost eight years to repay the lender).  Here,

there is no suggestion that Dawson has the financial ability to

pay in regular monthly installments the $20,499.16 in property

she has received, directly or indirectly, and retained as a

result of the transaction.[48]  However, she should safely and

easily be able to sell her home within a period of 18 months

after Thomas deposits a release of his deed of trust, if not

sooner, and tender the net loan proceeds to Thomas at closing of

such a sale.  That generous period of time to restore the status

---

[48] Dawson received, directly or indirectly, a total of $23,340.50 in property as a result of the transaction, but has already paid back $2,841.34.  It is appropriate that the $23,340.50 includes two items even though they were paid to third parties: the $8,629.77 reinstatement amount Dawson owed on her existing mortgage and the $503.97 in real property taxes paid incident to the transaction as property received by Dawson.  See Mayfield v. Vanguard Sav. & Loan Ass'n, 710 F. Supp. 143, 148 (E.D. Pa. 1989).  The existing mortgage and the real property taxes were existing credit obligations of Dawson and thus not incurred as part of the credit transaction at issue.  However, all of the other charges Dawson incurred in the transaction (including interest under the deed of trust note), regardless of whether Thomas profited from them, are not amounts that Dawson is deemed to have received in the transaction and Dawson is not responsible for tendering such amounts to Thomas.

quo is, again, justified by the egregious failure of Thomas to comply with multiple requirements of TILA.

Because I am giving Dawson a generous period of time within which to sell her home, I will, as in <u>Sterten</u>, require that, commencing on the date that Thomas deposits the release of his security interest with the court, the repayment of the net loan proceeds shall include interest not at the contract rate, but at a rate otherwise provided by law for the use of money, as an equitable requirement for permitting Dawson's delay in making her tender as part of the rescission remedy. Were I not to impose a provision for interest, Dawson would have every incentive to delay tendering repayment until just prior to the end of the 18-month period for making tender. Under D.C. Code § 28-3302(a) "[t]he rate of interest in the District upon the loan or forbearance of money, . . . in the absence of expressed contract, is 6% per annum." Accordingly, I will require that the repayment include interest at 6% per annum commencing on the date that Thomas files a notice of his depositing a release of his deed of trust. Interest prior to then is not appropriate as Thomas's violations of TILA were egregious, Thomas insisted on judicial resolution of whether he violated TILA (thereby engendering delay), and TILA contemplates that all finance charges (including interest owed under the parties' contract) are excused in making

rescission.[49]  But once rescission is decreed to be appropriate,

restoring the parties to the status quo should be measured as

though both parties carried out their rescission duties

simultaneously, it then being appropriate to charge the borrower

with interest at the legal rate in the District of Columbia for

the forbearance of money (in the absence of express contract) in

order to assure that what Thomas receives is equal in value to

what he would receive were he paid upon depositing a release of

his deed of trust.  In addition, Dawson will be required within

20 days to advise the court whether she still elects to pursue

the rescission remedy, and, if she does so elect, then, as a

condition to permitting her the option attempting to effect a

---

[49]  Rachbach v. Cogswell, 547 F.2d 502, 505 (10th Cir.
1976), found, based upon "an incomplete record," no abuse of
discretion in a trial court's having imposed as an equitable
condition to rescission an award of interest on the unpaid
principal of the loan from the date of the transaction.  I choose
to follow instead Semar v. Platte Valley Fed. Sav. & Loan Ass'n,
791 F.2d 699, 706 (9th Cir. 1986), (stating that Rachbach v.
Cogswell "contravenes 15 U.S.C. § 1635(b), which states that a
borrower is not liable for any finance charge, and 15 U.S.C. §
1605(a), which lists interest as an example of a finance charge.
We defer to Congress' method of enforcing TILA and follow the
plain language of the statutes." (footnote omitted)).  However,
Semar does not preclude the imposition of statutory interest for
the period after entry of a court's rescission decree.  Because §
1635(b) permits the court to modify the procedures of rescission,
it permits the court to grant Dawson a delay in making her
required tender and, correspondingly, to impose interest at the
statutory rate during the period of her delayed performance in
rescinding the transaction *after* Thomas deposits his release.
Dawson can avoid interest altogether by making prompt tender of
the net amounts she obtained.

rescission, any repayment of the loan (even if rescission is not
effected) shall include the 6% per annum interest charge
commencing on the date that Thomas files notice depositing the
release of his deed of trust with the court.

In making a return of the loan proceeds not yet repaid, the
amount Dawson must repay may be reduced by the amounts of
statutory damages and attorney's fees that she recovers.  See
Mayfield, 710 F. Supp. at 149.  Cf. Harris v. Tower Loan of
Miss., Inc., 609 F.2d 120, 123 (5th Cir.), cert. denied, 449 U.S.
826 (1980) (when (unlike here) a lender has received sums from
the obligor as part of the transaction, the lender must refund
such sums as part of the rescission process, but § 1635(b) does
not bar that lender's offsetting the value owed to it by the
obligor from the sum it must tender to the obligor).  There are,
however, decisions which bar a lender's setting off TILA damage
and attorney fee awards against obligations owed the lender.
Dias v. Bank of Haw., 732 F.2d 1401, 1402 (9th Cir. 1984); Wright
v. Tower Loan of Miss., Inc., 679 F.2d 437, 446 (5th Cir. 1982);
Plant v. Blazer Fin. Servs., Inc. of Ga., 598 F.2d 1357, 1366
(5th Cir. 1979) ("To allow a setoff would in effect relieve the
creditors in violation of the Act of the attorney's fee expense
in the case of an insolvent debtor."); Olevares v. Viking Dodge,
Inc., 626 F. Supp. 114 (N.D. Ill. 1985).  When a borrower is
rescinding her mortgage transaction, she affirmatively wants to

80

see the lender paid the full tender amount required of her so
that she accomplishes the rescission, and one might argue that it
should not matter to her that the dollars she utilizes to
accomplish that are the judgment amounts she recovers against the
lender or independent sums.  Moreover, a court should arguably
structure the rescission remedy in a manner that restores the
status quo as promptly as possible, and giving immediate credit
for judgment amounts owed by Thomas to Dawson would accomplish
that purpose and would be a permissible modification of the
rescission remedy under the last sentence of § 1635(b).

     However, Dawson may continue to need the services of her
attorney in order to bring this proceeding to a successful
conclusion, and requiring a setoff of her attorney fee award
against her rescission tender obligation might prevent a recovery
of moneys she needs to fund continued litigation of this matter
(including any appeals).  Because TILA should be construed in a
manner that advances its enforcement goals, I will not require
such a setoff, and I will direct Dawson within 20 days after
entry of this decision to advise whether she wishes to exercise
such a setoff (in whole or in part).  (To the extent that she
exercises such setoff, the setoff shall be effective as of the
date of this decision.)  The same will apply to the $2,000
statutory damage award that the court will make, below, pursuant
to § 1640(a)(2)(A)(iii).  But, for reasons explored later, as to

any recovery under § 1640(a)(4), the court will require that, if

Dawson files notice within the required 20 days that she elects

to continue to pursue the rescission remedy, such § 1640(a)(4)

recovery shall be set off against Dawson's obligations under the

loan.

C.

ACTUAL AND STATUTORY DAMAGES

Dawson has shown that Thomas committed multiple violations

of TILA in connection with this loan.  Section 1640 of 15 U.S.C.,

which governs civil liability for violations of TILA, provides in

pertinent part that:

(a)  Except as otherwise provided in this section, any
creditor who fails to comply with any requirement
imposed under this part, including any requirement
under section 1635 of this title, or part D or E of
this subchapter with respect to any person is liable to
such person in an amount equal to the sum of --

(1) any actual damage sustained by such person as
a result of the failure;

(2)(A)(i) in the case of an individual action
twice the amount of any finance charge in connection
with the transaction, (ii) in the case of an individual
action relating to a consumer lease under part E of
this subchapter, 25 per centum of the total amount of
monthly payments under the lease, except that the
liability under this subparagraph shall not be less
than $100 nor greater than $1,000, or (iii) in the case
of an individual action relating to a credit
transaction not under an open end credit plan that is
secured by real property or a dwelling, not less than
$200 or greater than $2,000; . . . .

(3) in the case of any successful action to

82

enforce the foregoing liability or in any action which
a person is determined to have a right of rescission
under section 1635 of this title, the costs of the
action, together with a reasonable attorney's fee as
determined by the court; and

    (4) in the case of a failure to comply with any
requirement under section 1639 of this title, an amount
equal to the sum of all finance charges and fees paid
by the consumer, unless the creditor demonstrates that
the failure to comply is not material.

Having established numerous violations of TILA, Dawson is
entitled to: (1) actual damages, 15 U.S.C. § 1640(a)(1); (2)
statutory damages of not less than $200 and not greater than
$2,000, § 1640(a)(2)(A)(iii); (3) costs and reasonable attorney's
fees, § 1640(a)(3); and, unless Thomas shows that his failure to
comply with § 1639 was not material, (4) "an amount equal to the
sum of all finance charges and fees paid by the consumer," §
1640(a)(4).

    Dawson has not established actual damages.  The court will,
however, award Dawson $2,000 in statutory damages under §
1640(a)(2)(A)(iii).  The finance charges Dawson paid at closing
were $11,659.50 (including $10,000.00 in lender's and broker fees
(Thomas's lender fee of $5,000.00 and Merwin's mortgage broker
fee of $5,000.00)), and twice that amount pursuant to §
1640(a)(2)(A)(i) would be in excess of $20,000.00.  Although the
starting point for computing statutory damages for a closed-end
mortgage like Dawson's is to calculate twice the finance charges
under § 1640(a)(2)(A)(i), the statute caps the amount that may be

83

recovered in the case of a closed-end mortgage on real property at $2,000.00 pursuant to § 1640(a)(2)(A)(iii). <u>Koons Buick Pontiac GMC, Inc. v. Nigh</u>, 543 U.S. 50, 62 (2004). Prejudgment interest is not allowed on an award of TILA statutory damages. <u>Marshall v. Sec. State Bank of Hamilton (In re Marshall</u>), 970 F.2d 383 (7th Cir. 1992). Dawson is also entitled to recover attorney's fees and costs.

That leaves the question of whether Dawson is entitled to a recovery under § 1640(a)(4). The failure to comply with § 1639 *was* material, and thus under § 1640(a)(4) Dawson may recover the $11,659.50 and $2,841.34 in finance charges and fees paid, respectively, at and after closing.

Section 1635(b) expressly provides that in rescinding under § 1635(a), the obligor "is not liable for any finance or other charges" and § 1640(a)(4) in turn provides for an affirmative recovery of paid finance charges and fees. But a borrower ought not both collect under § 1640(a)(4) the amount of finance charges and fees paid to a lender and effect a rescission by paying back a loan amount reduced by the amount of finance charges and fees that were paid for out of the borrowed funds. The borrower is required to return whatever amounts were lent to her. Here, Dawson borrowed $35,000.00, which included the $11,659.50 necessary to pay finance charges at closing. In making rescission, Dawson is obligated to repay that $11,659.50. Dawson

84

may not both have her cake and eat it too.

Because rescission is an equitable remedy of restoring the status quo, it makes sense to treat any recovery of the $11,659.50 in paid finance charges pursuant to § 1640(a)(4) as being applied to Dawson's obligation to repay a like amount of $11,659.50 of the lent funds. Similarly, the $2,841.34 in finance charges (consisting of interest-only charges) paid after closing may be recoverable under § 1640(a)(4), but in the interest of restoring the status quo promptly as part of the rescission process, that $2,841.34 amount should be treated as a credit towards repaying the lent amounts. See Sparkman v. Parkway Mortgage, Inc. (In re Bell), 314 B.R. 54, 58 (Bankr. E.D. Pa. 2004) (declining to reconsider judgment dismissing § 1640(a)(4) claims: "the Debtor's damages under § 1640(a)(4) will be recognized because the Loan has been rescinded and the Debtor will receive a credit against her repayment amount for all payments that she previously made to Parkway."). Cf. Armstrong v. Nationwide Mortgage Plan/Trust (In re Armstrong), 288 B.R. 404, 427 (Bankr. E.D. Pa. 2003) (no damages were recoverable under state consumer protection statute if the loan was being rescinded); In re Bell, 314 B.R. at 59 (same). Exercising equitable discretion in fixing the terms of rescission, the court will require that if Dawson files a notice within 20 days that she will proceed with rescission, then, even if she does not

85

later take the steps to effect the rescission, the $14,500.84 in
paid finance charges recoverable under § 1640(a)(4) will be
treated as applied to the $35,000.00 principal amount of the
loan, reducing the principal amount of the loan to $20,499.16.

Dawson is entitled to both rescind under § 1635 and recover
any double statutory damages imposed by § 1640(a)(2)(A).  See
Etta v. Seaboard Enterprises, Inc., 674 F.2d 913, 919 (D.C. Cir.
1982) (citing Eby v. Reb Realty, Inc., 495 F.2d 646 (9th Cir.
1974), and other decisions upholding the propriety of allowing
both double damages under § 1640(a) and rescission).  Logically
that holding applies to damages under § 1640(a)(4) as well.  Etta
recognized that the damages to which the borrower was entitled
"may be deductible in their entirety from the payment due on the
notes."  Etta, 674 F.2d at 919.  Nothing in Etta suggests that in
equitably fixing the terms of rescission, the court may not
require that the § 1640(a)(4) recovery to be set off immediately
against the outstanding principal required to be paid to effect a
rescission.  Unlike § 1640(a)(2)(A)(iii), § 1640(a)(4) permits a
recovery only of "finance charges and fees *paid* by the consumer"
(emphasis added), and the purposes of § 1640(a)(4) of undoing
such a payment are fully effectuated, when rescission is elected,
in treating the amount of finance charges and fees recoverable
under § 1640(a)(4) as immediately set off against and reducing
the borrowed amount required to be repaid by the borrower to

86

effect a rescission.[50]

   If Dawson fails to file notice that she intends to proceed

with rescission, then she will be entitled to either recover

finance fees and charges paid incident to the transaction or to

set those amounts off against the existing debt.  The finance

charges paid totaled $14,500.84.  Dawson is entitled to recover

that $14,500.84 pursuant to § 1640(a)(4).  She may, however, set

off the $14,500.84 against her loan obligations, and that would

_____

   [50]  Even when double damages under what is now §
1640(a)(2)(A) were at issue, the court in Eby stated:

      [W]hile we hold that sections 1635 and 1640 do not set
      forth exclusive remedies, we do not say that a court
      must always grant both forms of relief when requested.
      These two separate provisions can result in a sometimes
      harsh penalty.  In the absence of any clear
      congressional statement, we think a request for both
      forms of relief is addressed to a court's sense of
      equity and may properly be denied in appropriate cases.

Eby, 495 F.2d at 652.  It readily follows that when both
rescission and § 1640(a)(4) relief are sought, a court may
require that the § 1640(a)(4) recovery be set off immediately
against the principal of the loan in fixing the amount that must
be repaid to effect a rescission.  Requiring instead that the
lender pay the § 1640(a)(4) damages prior to the receipt of a
delayed tender by the borrower of the amount necessary to effect
an announced intention to rescind would be unduly harsh, and
inconsistent with the equitable goal in rescission of restoring
the status quo.

count as part of her repayment of the $35,000 loan.[51]

Within 20 days after entry of this decision, if Dawson does not file a notice that she intends to proceed with rescission, she shall file a notice stating whether she desires entry of a judgment to recover the $14,500.84 or, instead, a judgment decreeing that the $14,500.84 is set off against the mortgage debt.

If Dawson does not effect a rescission (either by electing not to file a notice of her intention to proceed with rescission or by reason of failing timely to pay the amount required to effect a rescission), she nevertheless will have no liability under the note for finance charges and fees financed via the loan.  The loan's eye-popping interest rate of 16% (which

---

[51]  The parties have not addressed the impact of such a reduction of the loan obligation via setoff on the repayment terms.  If Dawson timely announces that she will pursue rescission and effects the rescission, then the issue will be academic.  If she does not, then the obligation is treated as having been $35,000, and if the $14,500.84 recovery under § 1640(a)(4) is set off against that obligation, it is equitable to treat that $14,500.84 as counting towards Dawson's monthly loan payments, with Dawson being in default only if she missed a monthly payment once the amount of required monthly loan payments exceeded $14,500.84.

The loan terms required payments of $466.67, and, as explored later, under TILA, Dawson is not liable for interest charges.  Consequently, the $14,500.84 in monthly payments would be applied to principal as the note provided that "[e]ach installment when so paid [is] to be applied first to the payment of late charges, second to the payment of interest . . ., and the balance thereof . . . to the principal."  Monthly payments that Dawson made or makes in addition to that $14,500.84 would be applied first to late charges, if any, and then to principal.

increased automatically to 24% upon Dawson's default) and fees
and charges of $11,659.50 paid at closing that constituted new
obligations imposed on Dawson (out of a loan for only $35,000)
are precisely the types of damage that §§ 1639 and 1640(a)(4) are
designed to prevent.  An affirmative defense to a debtor's
invocation of § 1640(a)(4) is that under 15 U.S.C. § 1640(e), an
action for affirmative relief under § 1640(a)(4) must be brought
within one year, but for reasons already discussed, that
affirmative defense does not apply here.  Moreover, 15 U.S.C. §
1640(h) contemplates that a debtor may assert a violation of TILA
in a timely action, and thus, pursuant to her timely action,
Dawson is entitled to a declaration that she no longer owes
finance charges and fees, not simply to recover finance charges
and fees already paid.

Even if Dawson's action had been untimely, she is entitled
to a declaration of whether she no longer owes finance charges
and fees.  Once Thomas filed a proof of claim, Dawson was
entitled to raise the TILA violations as a defense to the proof
of claim.  Section 1640(h) bars a debtor from setting off
statutory double damages under § 1640(a)(2) against his mortgage
debt unless the amount of the creditor's liability under TILA has
been established by a court judgment.  Accordingly, a debtor
could ordinarily invoke such damages only via an action brought
within the one-year statute of limitations of § 1640(e) on

pursuing an action for affirmative relief under § 1640.  But §

1640(e) clarifies that its one-year statute of limiations:

> does not bar a person from asserting a violation of
> this subchapter in an action to collect the debt which
> was brought more than one year from the date of the
> occurrence of the violation as a matter of defense by
> recoupment or set-off in such action, except as
> otherwise provided by State law.

See also 15 U.S.C. § 1640(h) (consumer in default on the mortgage

obligation may assert a TILA violation "as an original action"

(meaning an action not barred by the one-year statute of

limitations of § 1640(e)) "or as a defense or counterclaim to an

action to collect amounts owed by the consumer brought by a

person liable under [TILA]."  By way of recoupment, a debtor may

assert TILA violations in response to a creditor's proof of claim

in order to limit the extent of the creditor's recovery on its

claim. See Coxson v. Commonwealth Mortgage Co. of America (In re

Coxson), 43 F.3d 189, 194 (5th Cir. 1995) ; Tarver v.

CitiFinancial Auto, Ltd. (In re Tarver), 2007 WL 1876369 (Bankr.

M.D. Ala. June 28, 2007); Sinclair v. Wash. Mut. Home Loans, Inc.

(In re Sinclair), 2004 WL 2192587 (Bankr. D. Kan. 2004);

Woolaghan v. United Mortg. Servs, Inc., 140 B.R. 377 (Bankr. W.D.

Pa. 1992).  Although the proof of claim is no longer being

asserted because the case has been dismissed, the dispute is not

moot because it is capable of repetition.  Accordingly, the court

will declare that even if Dawson does not rescind, she will not

be liable for finance charges, including interest.

If Dawson elects to pursue rescission, the court will
require that Thomas recover interest at 6% per annum on the
$20,499.16 from the date on which Thomas deposits his release of
his deed of trust.  If she does not elect to pursue the
rescission option, the note will not bear any interest, but the
deed of trust will be enforceable immediately in the event of a
default in monthly payments (after taking into account any setoff
amount that Dawson elects to invoke).

VIII

<u>VIOLATION OF THE D.C. HOME LOAN PROTECTION ACT</u>

The D.C. Home Loan Protection Act, D.C. Code §§ 26-1151.01 -
1155.01 (2002) ("HLPA"), prohibits certain predatory lending
practices with respect to residential loans that fall within the
statute's definition of "covered loan."  Pursuant to § 26-
1151.01(7)(A), a covered loan is:

> a mortgage loan, secured by property located in the
> District (including an open-end line of credit, but not
> including a mortgage loan insured or guaranteed by a
> state or local authority, the District of Columbia
> Housing Finance Agency, the Federal Housing
> Administration, or the Department of Veteran Affairs,
> or a reverse mortgage transaction), in which the terms
> of the mortgage loan exceed one or more of the
> following thresholds:

> (i) The loan is secured by a first mortgage on the
> borrower's principal dwelling and the annual percentage
> rate at closing will exceed by more than 6 percentage
> points the yield on United States Treasury securities
> having comparable periods of maturity to the loan
> maturity measured as of the 15th day of the month
> immediately preceding the month in which the
> application for the residential mortgage loan is

91

received by the creditor;

(ii) The loan is secured by a junior mortgage on the borrower's principal dwelling and the annual percentage rate at closing will exceed by more than 7 percentage points the yield on United States Treasury securities having comparable periods of maturity to the loan maturity measured as of the 15th day of the month immediately preceding the month in which the application for the residential mortgage loan is received by the creditor; or

(iii) The origination/discount points and fees payable by the borrower at or before loan closing exceed 5% of the total loan amount.

A mortgage loan, in turn, is defined in § 26-1151.01(14)(A)

to mean:

Any loan or other extension of credit:

(i) To a natural person primarily for personal, family, or household purposes;

(ii) That is secured by a lien instrument secured, in whole or in part, by residential real property located within the District which there is located, or there is to be located, a structure, intended principally for occupancy of from one to 4 families, and which is, or will be, occupied by the borrower as the borrower's principal dwelling; and

(iii) For which the principal amount does not exceed the conforming loan size limit for a comparable dwelling as established and revised from time to time by the Federal National Mortgage Association or the Federal Home Loan Corporation.

The defendants concede that if the court determines that the loan was obtained primarily for personal, family or household purposes, the loan falls within the statute's definition of a covered loan.  See D.C. Code § 26-1151.01(7)(A) (loan must be a "mortgage loan" to qualify as a covered loan); D.C. Code 26-

1151.01(14)(A)(i)(a "mortgage loan" is a loan "[t]o a natural

person primarily for personal, family, or household purposes.").

There is likewise no dispute that if the court determines that

the loan is a covered loan, the defendants' failure to make

certain disclosures as well as the inclusion of prohibited

provisions in the loan violated the Act.  As explained in further

detail below, the court determines that the loan was a covered

loan within the meaning of the statute and that the defendants

violated the D.C. Home Loan Protection Act.

A.

THE LOAN WAS OBTAINED PRIMARILY FOR PERSONAL,
FAMILY, OR HOUSEHOLD PURPOSES AND IS A COVERED LOAN
WITHIN THE MEANING OF THE D.C. HOME LOAN PROTECTION ACT

As discussed earlier in this opinion, Dawson obtained the

loan for primarily personal rather than business purposes.

Having so found, and there being no dispute that the fees

associated with the loan exceed 5% of the amount of the loan, the

court concludes that the loan is a covered loan within the

meaning of the D.C. Home Loan Protection Act, D.C. Code §§ 26-

1151.01 - 1155.01.

B.

DAWSON IS NOT EQUITABLY ESTOPPED FROM
ASSERTING A CLAIM UNDER THE D.C. HOME LOAN PROTECTION ACT

Although the court rejects the defendants' contention that

the loan was obtained primarily for business or commercial

purposes, the defendants argue that Dawson is nevertheless

93

equitably estopped from pursuing her HLPA claim or has waived any
such claim because she supplied materially incorrect information
in connection with her loan application leading the defendants to
believe that the loan was not a covered loan, to wit, Dawson
indicated that she did not live at the property and she signed an
affidavit stating that the loan was being obtained for the
commercial purpose of renovating the house for sale.[52] The court
rejects the defendants' estoppel defense because any reliance
upon Dawson's representations as to the property not being her
primary residence or her written contention, as memorialized in
the commercial purpose affidavit, that the loan was a commercial
loan, was unreasonable.

---

[52]  In making this argument, the defendants are not entitled
to rely on D.C. Code § 26-1152.02(c), which permits lenders to
challenge a borrower's HLPA claim in situations where a lender's
violation arose from a borrower having provided materially false
information in connection with his or her loan application.  To
invoke this provision, lenders are required to show that they
made a reasonable attempt to verify the current and expected
income and debts of the borrower, which the defendants in this
case failed to do.  Dawson urges that, because § 26-1152.02(c) is
an express statutory provision addressing a lender's rights when
the borrower has made material misrepresentations, the defendants
may only look to this express provision of HLPA and may not
instead rely upon equitable defenses.
     Although the defendants may, in fact, be required to look to
this express provision if they wish to defend on the basis that
Dawson is guilty of misrepresenting the purpose of the loan, the
court need not resolve the question of whether an equitable
remedy is available notwithstanding § 26-1152.02(c) because, even
if the defendants are entitled to assert an estoppel defense, the
court finds that the defendants did not reasonably rely upon
Dawson's alleged misrepresentations and the defense is rejected
accordingly.

C.

THE DEFENDANTS VIOLATED THE D.C. HOME LOAN PROTECTION ACT

(1)   The defendants failed to make an independent
      determination of the debtor's ability to repay under §
      26-1152.02.

Section 26-1152.02(a) of the D.C. Home Loan Protection Act
prohibits lenders from making covered loans "if the borrower, at
the time that the covered loan is closed, cannot reasonably be
expected to make the scheduled payments."  The statute further
provides that "[t]he lender's consideration <u>shall</u> include the
ability to make any payments for mortgage insurance premiums,
escrow deposits, or direct payment of real estate taxes and
property insurance premiums (in addition to the payments of
interest and principal) and the employment status of the
borrower.  The lender <u>may</u> consider the current and expected
income, current obligations, and other financial resources of the
borrower (other than the borrower's equity in the dwelling which
secures repayment of the loan)."  § 26-1152.02(a)(1) (emphasis
added).  Although the lender may consider the borrower's equity
in the dwelling to evaluate the borrower's likelihood of default,
for purposes of evaluating the borrower's ability to make the
scheduled payments "[t]he lender shall not consider the
borrowers' equity interest in the residential real property which
secures repayment of the covered loan."  D.C. Code § 26-1152.02
(a)(2).

95

Thus, in assessing Dawson's ability to make the scheduled

monthly payments, Thomas was required, at a minimum, to consider

the employment status of Dawson.   The record reflects that no

effort was made by either defendant to determine, _inter_ _alia_,

whether Dawson was employed.   Accordingly, Thomas violated D.C.

Code § 26-1152.02 by failing adequately to investigate whether

Dawson could reasonably be expected to make the scheduled

payments.

At trial, Thomas emphasized his expectation that the

Property would be sold and the proceeds thus made available to

Dawson to pay the balloon payment called for under the loan.

Thomas took the position that this satisfied his obligation to

verify Dawson's ability to repay the loan.   Although such

consideration is appropriate in determining whether a borrower

can reasonably be expected to make the required balloon payment,

D.C. Code § 26-1152.02(a)(3),[53] that alone does not discharge a

lender's broader obligation under D.C. Code § 26-1152.02(a) to

determine whether a borrower can be reasonably expected to make

---

[53]   Where a covered loan "includes payment terms under which
the aggregate amount of the scheduled payments will not fully
amortize the outstanding principal balance, the lender's
determination of the ability of the borrowers to make an expected
balloon payment at the scheduled maturity date may include
consideration of the borrowers' equity interest in the
residential real property and the borrowers' ability, based on
current market conditions, to refinance the covered loan without
penalty, hardship, or material loss of equity."   D.C. Code § 26-
1152.02(a)(3).

<u>all</u> of the scheduled payments, which includes the monthly

payments.[54]

> (2)   The terms of the loan included several provisions
> prohibited under the D.C. Home Loan Protection Act, and
> the defendants failed to take various actions required
> to be taken with respect to covered loans.

The loan instrument includes various provisions prohibited

under HLPA, including, <u>inter alia</u>, a provision that provides, in

violation of D.C. Code § 26-1152.09, for an interest rate of 16%,

to be automatically increased to 24% should the loan ever be in

default.   Likewise, HLPA prohibits balloon payments that come due

less than 7 years after the date of the loan closing, with an

exception provided for payment schedules that are adjusted to

account for the borrower's seasonal or irregular income, or if

the loan is a bridge loan connected or related to the acquisition

or construction of a dwelling intended to become the borrower's

principal dwelling.   D.C. Code § 26-1152.13.   The loan at issue

provides for a balloon payment due and payable 6 months after the

loan closing and does not fall within any of the aforementioned

---

[54]   Defendant Merwin testified that borrowers often use
disbursed funds to meet their payment obligations.   It would have
been unreasonable, however, for the defendants to assume that
Dawson would use the disbursed funds to make her monthly
payments.   There is no evidence that the defendants ever
discussed such use of the funds with Dawson and there is likewise
no evidence that Dawson ever indicated an intention to use the
loan proceeds to meet her payment obligations.   Furthermore, if
the defendants were expecting Dawson to use the disbursed funds
to meet her monthly payment obligations, such a belief directly
contradicts the defendants' stated belief that the intended use
of those proceeds was the renovation of the Property.

exceptions.  Accordingly, the balloon payment provision of the loan violates D.C. Code § 26-1152.13.

The statute likewise provides that lenders "shall send to the borrower a Red Flag Warning Disclosure Notice" in making a covered loan that "shall be received by the borrower at least 3 business days prior to the closing of the loan. . . [and] [i]f the loan is originated with the assistance of a mortgage broker, the mortgage broker shall provide the Red Flag Warning Disclosure Notice." D.C. Code § 26-1152.11   The defendants concede that no red flag warning disclosure notice was sent.  Because the statute places the burden of sending the notice upon the broker, the court finds that Merwin violated § 26-1152.11 by failing to send the requisite notice.

Similarly, Thomas failed to satisfy the filing requirements of D.C. Code § 26-1152.21, which requires lenders to submit to the Mayor a loan package including the settlement statement, the FP-7 Form filed with the Recorder of Deeds, the final Truth in Lending Act disclosure, and the note.  As there is no dispute that defendant Thomas failed to send a loan package to the Mayor as required, the court finds that defendant Thomas violated § 26-1152.21.

Finally, Thomas concedes that he failed to verify that Merwin was licensed at the time of the transaction, and Merwin concedes that he was, in fact, not licensed.  This constitutes a

98

violation of D.C. Code § 26-1152.20.

Dawson has further alleged that the loan included impermissible charges for services not actually performed or for loan discount points which are not bona fide discount points. See D.C. Code § 26-1152.10. Although a "consulting fee" of $5,000 and a "lender's fee" of $5,000 might be found on a fuller evidentiary record to fall within this category of prohibited charge, Dawson failed to establish by way of evidence or argument the applicability of this provision to the charges present in the instant transaction.

Likewise, Dawson has not demonstrated that the loan was extended with the intent to foreclose. The court is mindful that, in some instances, loans based solely upon the value of the property securing a loan may be designed to fail, with the lender's anticipated profit arising from acquisition of the property on default rather than through loan payments.[55] See Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7, 20-21 (D.D.C. 2000). According to D.C. Code § 26-1114(a)(6), in determining whether the loan was made with intent to foreclose, the court may consider the following factors: "(A) Lack of the probability of full repayment of the loan by the borrower; and (B) A significant proportion of similarly foreclosed loans by the

---

[55] This practice is commonly referred to as equity-stripping.

lender." Although the court finds that the defendants failed
adequately to verify Dawson's ability to make scheduled payments
under the loan, the court credits Thomas's testimony that, in
extending loans of this nature, he hoped to obtain the listing to
sell the borrower's property. Although Thomas's carelessness in
verifying Dawson's repayment ability may be explained by his
unwarranted expectation that Dawson would voluntarily and
expeditiously sell the Property, that is not the same as engaging
in the transaction with the intent to foreclose. Similarly,
Dawson failed to establish the existence of "[a] significant
proportion of similarly foreclosed loans by the lender . . . ."
D.C. Code § 26-1114(6)(B). Accordingly, the court finds that the
defendants did not violate § 26-1114(a)(6).

(3) Damages

HLPA permits borrowers to seek

(1) Reformation of the covered loan to correct or
remove an unfair term or a term obtained in violation
of § 26-1151.02 of subchater II of this chapter . . . ;
(2) Actual damages;
(3) Injunctive relief;
(4) Reasonable attorneys' fees and costs; or
(5) Statutory damages in an amount to be determined by
the finder of fact if the finder of fact determines
that the lender has engaged in a systematic pattern of
practices and acted in violation of § 26-1151.02 or
subchapter II of this chapter.

D.C. Code § 26-1153.01(c).

The court determines that Dawson is entitled to reformation
of the loan on terms consistent with acceptable consumer lending

100

practices, such that the original interest rate of 16% shall be
reinstated (with the provision for increasing the interest rate
to 24% in the event of a default eliminated),[56] the balloon
payment shall come due September 13, 2010 (seven years after the
September 13, 2003, closing date), and the balance due on the
loan shall be reduced by the amount of any penalties or fees that
can be traced to the rate increases triggered by the provision of
the loan calling for a balloon payment by March 14, 2004.[57]  In
addition, the note called for a late fee of 10%, but D.C. Code §
28-3310(b)(3) limits late fees to 5%, and it is appropriate to
remove the 10% late fee term as an unfair term and to replace it
with a 5% late fee.  Finally, the note provided:

> [I]n the event of Default and at the sole discretion of
> the Lender, if said note is modified, extended, default
> cured, or fully paid and satisfied, there shall be an
> administrative / reinstatement fee equal to two and
> one-half percent (2.5%) of the principal balance and
> all outstanding interest and penalties.

On its face, that provision is unfair in charging a fee on the

---

[56]  Under TILA, by reason of § 1640(a)(4), Thomas is not
entitled to retain any finance charges, including interest, that
Dawson paid.  Accordingly, prior monthly payments by Dawson shall
be applied to principal, not interest.

[57]  The HLPA remedies will be academic if Dawson rescinds
the loan transaction.  Accordingly, the court will not attempt to
fix with exactitude the amounts that Dawson would owe under a
note reformed pursuant to HLPA, but will instead simply declare
the provisions that are to be reformed, and retain jurisdiction
to enforce the court's decree if there is a dispute regarding the
proper accounting of amounts that were improperly charged to
Dawson as a result of the interest rate increase triggered by the
provision calling for an impermissible balloon payment.

entire loan balance, not just the amount of the missed payment.
In any event, it is a form of a late charge and as another clause
of the note (as reformed by this decision) already calls for a
late fee of 5% of any missed payment, the maximum allowable, this
provision will be stricken as an unfair provision.

As in the case of TILA, Dawson has not shown any actual
damages arising from the violations of HLPA.   There is no
evidence that Thomas has engaged in a systematic pattern of
practices, and, accordingly, no statutory damages can be awarded.
There being no actual or statutory damages, the only relief being
granted (reformation of the terms of the loan) runs against
Thomas, not Merwin.   The court determines that Dawson is entitled
to recover reasonable attorney's fees from Thomas based upon his
violations of HLPA.[58]   As to Merwin, no relief is being granted
and, accordingly, it would be inappropriate to award attorney's
fees against him.

IX

## THE D.C. CONSUMER PROTECTION PROCEDURES ACT

The D.C. Consumer Protection and Procedures Act, D.C. Code
§§ 28-3901 - 3908 (2001) ("CPPA") has been characterized as
ambitious legislation, and "is a comprehensive statute designed

---

[58]   To the extent any damages or attorney's fees awarded
under HLPA are duplicative of those already awarded Dawson under
TILA, Dawson is only entitled to claim one such recovery or
offset.

to provide procedures and remedies for a broad spectrum of practices which injure consumers." <u>Atwater v. D.C. Dep't of Consumer & Regulatory Affairs</u>, 566 A.2d 462, 465 (D.C. 1989). A central purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1); <u>Dist. Cablevision Ltd. P'ship v. Bassin</u>, 828 A.2d 714, 723 (D.C. 2003).

The amended complaint alleges that the defendants violated D.C. Code § 28-3904(a) by mischaracterizing the loan as a commercial loan when it was in fact a consumer loan, and that they further violated D.C. Code § 28-3904(r) by entering into such contract where there was no reasonable probability of payment in full, or where the consumer was taken advantage of due to age, physical or mental infirmities, ignorance, illiteracy, or similar factors.

Dawson has not shown that the defendants violated § 28-3904(a) by representing that the transaction had characteristics that it did not have. Section 28-3904(a) contemplates a knowing and deliberate misrepresentation of goods and services, and although the defendants failed to take reasonable steps to ascertain the true purpose of the loan and to verify the nature of the property securing the loan, willful blindness is not the same as actual knowledge, and it has not been established that the defendants actually knew that the product they were offering

103

was required to be treated as a consumer rather than as a
commercial credit transaction.  Absent a showing that the
defendants actually knew that the loan was required to be
processed as a consumer credit transaction, they cannot be held
liable under section 28-3904(a).

Dawson has likewise failed to show that the defendants
violated § 3904(r) by making or enforcing unconscionable terms or
provisions by soliciting, consummating, and enforcing what was
required to be, but was not, treated as a consumer credit
transaction.  The court is mindful that the District of Columbia
Court of Appeals has expressly certified that CPPA § 28-3904(r)
is applicable to the extension of credit secured by the
consumer's house even where the credit is not extended in the
context of a sale of the house.  DeBerry v. First Gov't Mortgage
& Investors Corp., 743 A.2d 699 (D.C. 1999).  Section 28-3904(r),
however, provides a non-exclusive list of factors courts may
consider in applying this provision, including whether the party
alleged to have violated the CPPA knew, at the time of the sale,
"that there was no reasonable probability of payment in full of
the obligation by the consumer."   D.C. Code § 28-3904(r)(1).  As
discussed earlier in this opinion, the defendants failed to take
reasonable steps to determine whether Dawson would be able to
meet all of her payment obligations under the loan.  Failure to
verify Dawson's repayment ability, however, is not the same as

104

actually knowing "that there was no reasonable probability of payment in full of the obligation by the consumer." As with § 3904(a), section 3904(r)(1) contemplates actual knowledge on the part of the offending party, and while other statutes such as TILA impose liability upon lenders who willfully turn a blind eye to pertinent facts such as a borrower's ability to repay the obligation, a finding of liability under the D.C. Consumer Protection Procedures Act requires something more.

This does not, however, end the court's inquiry. Section 28-3904(r)(5) further provides that, in applying this subsection, consideration shall also be given to a person having "knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reason of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors." Whether the defendants knowingly took advantage of Dawson's lack of sophistication such that they should be found to have committed a violation of § 28-3904(r)(5) is a close call, as Dawson is unquestionably an unsophisticated borrower and the defendants were undoubtedly on notice of that lack of sophistication. Although Dawson's lack of sophistication made her less likely to understand the terms of the loan and the consequences of having the loan treated as a commercial rather than as a consumer transaction, when viewing the totality of the circumstances, the

105

court is not persuaded that it was the defendants' intent to

exploit the defendants' lack of sophistication in extending this

loan.   Instead, it appears that the defendants were preying upon

Dawson's precarious financial circumstances and the imminent

foreclosure sale of her home.   Accordingly, the court finds that

Dawson failed to demonstrate that the defendants violated § 28-

3904(r) by taking advantage of her inability to protect her

interests due to her lack of sophistication.


                              X

                          CONCLUSION

        An order follows.

                              [Signed and dated above.]



Copies to:

All counsel and parties of record;
Cynthia A. Niklas, Chapter 13 Trustee;
Office of United States Trustee.


                             106

C:\Laura\OPINIONS\Dawson v Thomas\Dawson vs Thomas FFCL_final.wpd